2005 WY 154

**Carly Mesa CATHCART, Appellant (Plaintiff),**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellee (Defendant).**

No. 05–43.

Supreme Court of Wyoming.

Dec. 1, 2005.

Representing Appellant: Terry W. Mackey of Moriarity, Gooch, Badaruddin & Booke, LLC, Cheyenne, Wyoming; Todd H. Hambrick and Stephanie A. Hambrick of Krampner, Fuller & Hambrick, Casper, Wyoming; Shawna M. Geiger of Shawna Mackey–Geiger, P.C., Greenwood Village, Colorado. Argument by Mr. Mackey.

Representing Appellee: Julie Nye Tiedeken of Tiedeken & Scoggin, Cheyenne, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

KITE, Justice.

[¶ 1] Carly Mesa Cathcart[1] was the driver of an automobile involved in a one car rollover. The automobile belonged to her

---

1. At the time of the accident, Ms. Carly Mesa was unmarried. She subsequently married and took her husband's name of Cathcart.

grandparents and was insured by State Farm Mutual Automobile Insurance Company (State Farm). Following the accident, State Farm paid Ms. Cathcart $75,000 under the uninsured motorist coverage provision of the policy to settle her claims.

[¶ 2] Nearly four years later, Ms. Cathcart filed breach of contract and first party bad faith claims against State Farm for its actions and inactions in negotiating the settlement with her following the accident. The district court granted summary judgment in favor of State Farm on the breach of contract claim. The bad faith claim proceeded to trial and the jury returned a verdict in favor of State Farm. Ms. Cathcart appealed claiming the district court erred in: 1) granting summary judgment on her breach of contract claim; 2) allowing evidence at trial of the underlying accident, including the discovery of a marijuana pipe at the accident scene and alleged marijuana use by Ms. Cathcart prior to the accident; 3) allowing juror questions during the trial; and 4) giving certain jury instructions and refusing others. We affirm.

## ISSUES

[¶ 3] Ms. Cathcart presents the following issues:

1. The trial court committed error when it failed to rule on the appellee's obligations under the insurance contract and granted summary judgment in favor of appellee on appellant's breach of contract claim.

2. The trial court committed error when it allowed evidence of the underlying incident giving rise to appellant's claim for breach of the duty of appellee to act in good faith with fair dealing.

3. The trial court committed error when it allowed evidence of a marijuana pipe and marijuana use to be presented to the jury.

4. The trial court's decision to ask questions submitted by the jury in this case was an abuse of discretion/error, and resulted in unfair prejudice to the appellant because the jury was allowed; and did, in fact, start advocating/deliberating

before all of the evidence had been presented.

5. The trial court committed error in the giving of certain jury instructions and not giving others.

State Farm restates the issues as follows:

1. Did the trial court correctly grant State Farm summary judgment on appellant's breach of contract claim for the reason that there was no material issue of fact to be decided by the trier of fact?

2. Did the trial court properly allow evidence of the motor vehicle accident which gave rise to appellant's claim for breach of the duty of good faith and fair dealing to be admitted into evidence during trial?

3. Did the trial court properly allow the jury to hear about the factors considered by State Farm in its evaluation, including witness statements of marijuana use by Carly Mesa?

4. Did the trial court properly allow the jurors to submit questions to be asked of witnesses pursuant to Rule 39.4 of the Wyoming Rules of Civil Procedure?

5. Did the court correctly [instruct] the jury on the law?

## FACTS

[¶ 4] On July 17, 1997, 17–year–old Carly Cathcart was driving a vehicle belonging to her grandparents, Al and Angie Mesa, on Interstate 25 near Casper, Wyoming when it left the roadway at a high rate of speed, rolled and came to a stop on its top in the median. Ms. Cathcart suffered serious injuries, including a closed head injury, broken neck and fracture of the pubic rami bones.

[¶ 5] At the time of the accident, the vehicle was insured by State Farm. In the course of investigating the accident, State Farm's claims representative, Rick Trujillo, interviewed several eyewitnesses, two of whom stated that another vehicle swerved into the passing lane in front of Ms. Cathcart's vehicle, cutting her off and causing her to swerve, lose control of her vehicle and go off the road. Although other eyewitnesses did

not observe another vehicle, Mr. Trujillo notified the attorney representing the passengers in the Cathcart vehicle and Ms. Cathcart's mother that they might be entitled to pursue uninsured motorist claims.

[¶ 6] The State Farm policy provided $100,000 in coverage for uninsured motorist claims. Based upon its investigation of the accident and potential claims, State Farm's claims committee gave Mr. Trujillo authority to settle Ms. Cathcart's claim for $100,000. After talking with his supervisor, Mr. Trujillo extended an offer to Ms. Cathcart and her father to settle the claim for $75,000. On the day of Ms. Cathcart's 18th birthday, Mr. Trujillo met with Mr. Mesa and Ms. Cathcart, and Ms. Cathcart accepted the check for $75,000 and signed a release of her claims against State Farm.

[¶ 7] Four years later, Ms. Cathcart filed a complaint alleging that State Farm breached the insurance contract by failing to comply with the uninsured motorist provision of the policy and breached the covenant of good faith and fair dealing by (1) settling the claim with a brain damaged minor without court approval; (2) failing to adequately investigate the claim; and (3) failing to pay policy limits.[2] State Farm filed an answer denying the claims and a notice of removal to federal district court. The case was removed to federal court, however, upon Ms. Cathcart's motion, it was remanded to state court.[3]

[¶ 8] Back in state district court, State Farm moved for summary judgment on all of Ms. Cathcart's claims. After a hearing, the district court entered an order granting summary judgment on the claims for intentional and negligent infliction of emotional distress; postponing a ruling on the fraud claim until completion of discovery; allowing additional briefing on the breach of contract and breach of statutory duty claims; and denying the motion on the bad faith claim. When Ms. Cathcart and State Farm submitted no additional briefing on the breach of contract and breach of statutory duty claims, the district court entered a subsequent order granting summary judgment on the breach of contract claim and denying summary judgment on the breach of statutory duty claim. With these rulings, the claims left for trial by jury were breach of statutory duty, breach of the implied covenant of good faith and fair dealing, and fraud.

[¶ 9] Prior to trial, Ms. Cathcart filed motions in limine requesting an order prohibiting the introduction of evidence at trial of her alleged marijuana use and her liability for the accident. The district court denied the motions. Ms. Cathcart also filed a motion for partial summary judgment in which she sought rulings that as a matter of law, the amount of damages due to her under the policy was not fairly debatable and State Farm's failure to pay the full amount of coverage was a breach of its duty of good faith and fair dealing. State Farm also filed a second motion for summary judgment on the claims for bad faith, breach of statutory duty, fraud and punitive damages. No order appears in the record on these motions.

[¶ 10] On August 16, 2004, the case proceeded to trial. Eleven days later, the jury

---

**2.** In her complaint, Ms. Cathcart also alleged claims for breach of the duty imposed by Wyo. Stat. Ann. § 26–15–124(c) (LexisNexis 2005), failure to investigate and evaluate the insurance claim, intentional infliction of emotional distress, negligent infliction of emotional distress, fraud and punitive damages.

**3.** Pursuant to 28 U.S.C. §§ 1441 and 1446, cases are removable to federal court when the parties are citizens of different states and the amount in controversy exceeds $75,000. 28 U.S.C. § 1446(d) requires a notice of removal to be filed within 30 days after receipt by the defendant of the complaint or first pleading from which it can be ascertained that the case meets the criteria for removal. Ms. Cathcart filed her complaint on May 21, 2002. State Farm filed its answer on June 20, 2002. State Farm filed its notice of removal on October 17, 2002, claiming Ms. Cathcart alleged unspecified damages in her complaint and that it became clear she was claiming damages exceeding $75,000 only when she responded to requests for admissions in October, 2002. Ms. Cathcart filed a motion for remand on October 28, 2002, asserting the removal notice was untimely. Without considering the remand motion, the federal district court entered an order of removal on December 9, 2002. Upon consideration of the remand motion, the federal district court concluded State Farm's removal notice was untimely because it was not filed within 30 days after receipt of the complaint, from which it could be ascertained that the amount in controversy exceeded $75,000.

returned a verdict finding that State Farm did not breach the duty of good faith and fair dealing or commit fraud in the manner in which it dealt with Ms. Cathcart's claim. The district court entered judgment on the jury verdict. Ms. Cathcart filed a motion for new trial which the district court denied following a hearing. Ms. Cathcart appealed.

## STANDARD OF REVIEW

[¶ 11] We review orders granting summary judgment according to the following standards:

> "Wyo. R. Civ. P. 56 governs summary judgments. A summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. W.R.C.P. 56(c). When reviewing a summary judgment, we consider the record in the perspective most favorable to the party opposing the motion and give that party the benefit of all favorable inferences which may be fairly drawn from the record. We review questions of law de novo without giving any deference to the district court's determinations."

*Baker v. Ayres and Baker Pole and Post, Inc.*, 2005 WY 97, ¶ 14, 117 P.3d 1234 (Wyo. 2005) (citation omitted).

[¶ 12] We review the district court's decisions concerning the admissibility of evidence for abuse of discretion. *Smyth v. Kaufman*, 2003 WY 52, ¶ 13, 67 P.3d 1161, 1165–66 (Wyo.2003). We adopt the same abuse of discretion standard for reviewing alleged error in the district court's decision to allow juror questions.[4]

[¶ 13] Our review of claimed error with respect to jury instructions is controlled by W.R.C.P. 51(b), which provides as follows:

> (b) *Further instructions; objections.*—At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on

the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury. Before the argument of the case to the jury has begun, the court shall give to the jury such instructions on the law as may be necessary.... No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

*Landsiedel v. Buffalo Properties, LLC*, 2005 WY 61, ¶ 5, 112 P.3d 610, 612 (Wyo.2005). If an objection properly is lodged, the appellate court reviews the instruction for error and prejudicial effect. *Daley v. Wenzel*, 2001 WY 80, ¶ 29, 30 P.3d 547, 554 (Wyo.2001).

## DISCUSSION

### 1. Summary Judgment on Breach of Contract Claim

[¶ 14] Ms. Cathcart's breach of contract argument is somewhat difficult to follow. She asserts the district court improperly based its summary judgment ruling solely on the fact that she accepted the $75,000 settlement offer and she released any other claims. She argues the insurance contract unambiguously required State Farm to decide if she was legally entitled to collect damages and, if so, to determine the amount. She argues the district court failed to make the fundamental determination required in all breach of contract claims, that is, whether or not the insurance contract was ambiguous. Regardless of its conclusion in that regard, however, she asserts the district court should have concluded State Farm breached the contract, either by failing to follow its unambiguous terms or by failing to comply with its ambiguous terms when construed in favor of the insured. She further argues the district court's error in this regard prejudiced her ability to present her bad faith claim to the jury. Unable to show that State Farm failed to comply with the insurance contract, she

---

4. Most courts conclude that the submission of jurors' questions to witnesses is left to the discretion of the district court and will not give rise to reversal absent an abuse of discretion. *State v.*

*LeMaster*, 137 Ariz. 159, 669 P.2d 592, 595 (1983); *DeBenedetto v. Goodyear Tire & Rubber, Co.*, 754 F.2d 512, 519 (4th Cir.1985).

claims, she likewise was unable to show that it breached the covenant of good faith and fair dealing. Additionally, she asserts the district court erred in granting summary judgment prior to the discovery cutoff date, hampering her ability to present evidence demonstrating the existence of genuine issues of material fact.

[¶ 15] State Farm contends the insurance contract clearly and unambiguously provided that the amount payable under the uninsured motorist provision could be decided by agreement of the parties. The parties agreed on the sum of $75,000. In exchange for payment of that amount, Ms. Cathcart signed a contract in full settlement of her claim, releasing any further claims under the uninsured motorist provision and barring her from seeking further payments. Given this undisputed evidence, State Farm argues, there were no genuine issues of material fact and the district court properly granted summary judgment on the breach of contract claim.

[¶ 16] Responding to Ms. Cathcart's claim that the district court prematurely granted summary judgment, State Farm asserts there were no discovery disputes at the time of the summary judgment hearing, it was undisputed that she had signed a full and final release, and by the time of the hearing, discovery had been ongoing for a year and the depositions of all the main witnesses had been taken. Moreover, State Farms argues, Ms. Cathcart points to no evidence discovered after the summary judgment order to change the fact that she accepted the $75,000 and released her claims under the policy.

[¶ 17] The record before this Court contains no transcript of the summary judgment hearing and no decision letter setting forth the district court's ruling. The only documentation contained in the record is the district court's initial summary judgment order, in which it did not decide the issue and gave the parties time to file additional briefs on the breach of contract claim, and the subsequent order summarily granting the motion after Ms. Cathcart failed to file a supplemental brief. Thus, we have no way of knowing the basis for the district court's decision to grant summary judgment on the breach of contract claim.[5]

[¶ 18] Irrespective of the district court's reasoning, however, the standards governing our review of summary judgments on breach of contract claims are firmly established. As we said in *Principal Life Ins. Co. v. Summit Well Service, Inc.*, 2002 WY 172, ¶¶ 17–19, 57 P.3d 1257, 1262 (Wyo.2002) (citations omitted):

An insurance policy constitutes a contract between the insurer and the insured. As with other types of contracts, our basic purpose in construing or interpreting an insurance contract is to determine the parties' true intent. We must determine intent, if possible, from the language used in the policy, viewing it in light of what the parties must reasonably have intended. The nature of our inquiry depends upon how clearly the parties have memorialized their intent. Where the contract is clear and unambiguous, our inquiry is limited to the four corners of the document.

We interpret an unambiguous contract in accordance with the ordinary and usual meaning of its terms. The parties to an insurance contract are free to incorporate within the policy whatever lawful terms they desire, and the courts are not at liberty, under the guise of judicial construction, to rewrite the policy. It is only when a contract is ambiguous that we construe the document by resorting to rules of construction. Whether a contract is ambiguous is a question for the court to decide as a matter of law.

A contract is ambiguous if indefiniteness of expression or double meaning obscure

5. The only indication in the record concerning the trial court's reasoning is found in the transcript of the hearing conducted on Ms. Cathcart's new trial motion after the verdict and judgment were rendered. At that time, in discussing the breach of contract claim the trial court indicated that without moving to set aside the release, Ms. Cathcart had no breach of contract claim other than the claim that State Farm did not treat her fairly, which was the essence of her bad faith claim. Absent a rescission of the release and return of the amount paid, the trial court concluded, there was no pure breach of contract claim and all that remained was the bad faith claim.

the parties' intent. Ambiguity cannot be created by the subsequent disagreement between the parties regarding the meaning of a contract. If the meaning of a provision in a contract is not readily apparent, the court may resort to competent evidence of extraneous circumstances to determine the parties' intent. Reviewing courts are free to make a determination as to the existence of ambiguity whether or not the parties agree one way or the other and whether or not the trial court has reached a conclusion one way or the other.

[¶ 19] In claiming summary judgment was improper on her breach of contract claim, Ms. Cathcart points to the following language of the insurance policy:

In order to determine the amount payable under uninsured motor vehicle coverage, two questions must be decided:

1. Is the *insured* legally entitled to collect damages from the owner or driver of the *uninsured motor vehicle;* and

2. If so, in what amount?

She contends this language unambiguously required State Farm to answer these two questions. Given that State Farm made a payment to her, she contends the answer to the first question was undisputedly "yes". The remainder of her argument is difficult to discern, but seems to be that the district court erred in granting summary judgment because genuine issues of material fact existed as to whether State Farm breached the provision by failing to make a good faith decision as to the amount she was entitled to collect from the uninsured motorist.

[¶ 20] In response, State Farm points to the provision cited by Ms. Cathcart and the provision following it:

In order to determine the amount payable under uninsured motorist vehicle coverage, two questions must be decided:

1. Is the *insured* legally entitled to collect damages from the owner or driver of the *uninsured motor vehicle;* and

2. If so, in what amount?

The questions can be decided by agreement between the *insured* and us.

[¶ 21] State Farm contends summary judgment was proper because the policy language is unambiguous and the evidence was undisputed that, in accordance with that language, the questions were decided by agreement between the parties when Ms. Cathcart and her parents agreed to accept the $75,000 State Farm offered in full payment of the uninsured motorist claim.

[¶ 22] We agree that the policy language is clear and unambiguous. Therefore, we limit our inquiry to the four corners of the document and interpret it in accordance with the ordinary and usual meaning of its terms. Pursuant to the clear language of the policy, in determining the amount payable to Ms. Cathcart under the uninsured motorist provision, State Farm was required to decide if Ms. Cathcart was legally entitled to collect damages from the uninsured motorist and, if so, the amount. Pursuant to the clear language of the policy, these determinations could be made by agreement between the parties.

[¶ 23] Considering the record in the light most favorable to Ms. Cathcart, and giving to her all favorable inferences that may be drawn from the evidence presented in support of State Farm's summary judgment motion on the breach of contract claim, the undisputed evidence was that State Farm concluded that if the witness testimony concerning the phantom vehicle was believed, there was a chance that Ms. Cathcart would be adjudged legally entitled to collect damages from the uninsured motorist. Thus, it is undisputed that State Farm complied with the first requirement of the policy provision. Thereafter, the evidence was undisputed that State Farm estimated that although Ms. Cathcart's actual damages exceeded the policy limits of $100,000, her damages would be reduced by some percentage for her comparative fault in causing the accident. Using a 40 to 50 percent comparative fault figure, State Farm estimated the amount Ms. Cathcart was legally entitled to collect from the uninsured motorist was between $59,500 and $69,000. Thus, the evidence was undisputed that State Farm made the second determination it was required to make under the provision. Thereafter, State Farm made an offer of $75,000. Ms. Cathcart and her father

accepted the offer, signed a full and final release in settlement of her claims and accepted the $75,000 check from State Farm.[6] There simply was no evidence that State Farm breached the uninsured motorist provision of the policy. Therefore, the district court properly granted summary judgment on Ms. Cathcart's breach of contract claim.

[¶ 24] We are not persuaded by Ms. Cathcart's further contention that the district court's ruling on the breach of contract claim prejudiced her ability to present her claim for breach of the implied covenant of good faith and fair dealing.

> Wyoming has recognized that a breach of the implied covenant of good faith and fair dealing may be actionable in contract for compensatory damages. Wyoming has also acknowledged that a breach of the implied covenant of good faith and fair dealing which rises to the level of an independent tort is actionable for compensatory and punitive damages under proper circumstances. A recovery in tort for the breach of the duty of good faith and fair dealing is premised upon the existence of a special relationship created by the unequal bargaining power that an insurer has over an insured.

*State Farm Mutual Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 825 (Wyo.1994) (citations omitted). The independent tort theory adopted by this Court imposes an obligation that neither party will do anything to injure the right of the other to receive the benefits of the agreement. *Id.*

> Liability, in tort, is imposed not for a bad faith breach of contract, but for the failure to comply with the duty of good faith and fair dealing. The duty of good faith and fair dealing is not a requirement mandated by the terms of the policy.
>
>> It is the obligation, deemed to be imposed by the law, under which the insurer must act fairly and in good faith in discharging its contractual responsibilities. Where in so doing, it fails to deal *fairly and in good faith* with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing.

*Id.*

[¶ 25] To establish a breach of an insurance contract, the insured must show the existence of a contract, a breach and damages. To establish a breach of the implied covenant of good faith and fair dealing, the insured must show: 1) the absence of any reasonable basis for denying a claim for benefits; and 2) the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim for benefits. *Shrader*, 882 P.2d at 825. Thus, the two claims require proof of independent elements and are not mutually dependent, meaning one can be maintained without the other. While an insured may state causes of action for breach of contract and breach of the duty of good faith and fair dealing, the insured does not need to prevail on the breach of contract claim to prevail on the claim for breach of the duty of good faith and fair dealing. *Id.* The district court's ruling that no genuine issue of material fact existed on the question of whether State Farm made the determinations required by the uninsured motorist provision had no legal effect upon Ms. Cathcart's ability to present her claim that State Farm knew there was no reasonable basis for denying her uninsured motorist claim. Despite the district court's ruling, Ms. Cathcart still had a full opportunity to present the latter claim.

[¶ 26] Addressing Ms. Cathcart's contention that the district court prematurely granted summary judgment prior to the discovery cut-off, we note the following rather unusual course of events. Ms. Cathcart filed her complaint against State Farm in state

**6.** Although neither party adequately briefed the issue, the law is clear in Wyoming that a settlement agreement constitutes a contract subject to the legal principles applicable to all contracts. *Wyoming Sawmills, Inc. v. Morris*, 756 P.2d 774, 779 (Wyo.1988). Thus, the release Ms. Cathcart signed constituted a contract. Although a release can be set aside in Wyoming upon grounds of mutual mistake, duress or unconscionable bargain, Ms. Cathcart did not seek to set it aside nor did she claim that she signed the release based upon any of these grounds.

district court in May 2002. The case was removed to federal court five months later. On February 13, 2003, an initial pretrial conference was held in accordance with federal practice and procedure. Following the conference, the court entered an order requiring the parties to complete discovery and file dispositive motions by July 7, 2003. Pursuant to the order, State Farm filed a summary judgment motion on February 28, 2003. Ms. Cathcart requested additional time to respond and the federal court granted an extension until March 21, 2003. Before that date, however, on March 11, 2003, the federal court entered an order remanding the case to state district court.

[¶ 27] Back in state district court, State Farm simply re-filed the summary judgment that had been pending in federal court. Subsequently, the state district court held a scheduling conference and set new deadlines for completing discovery and filing dispositive motions. The scheduling order entered in state district court on April 22, 2003, set pending motions for hearing on May 28, 2003, and required the parties to complete discovery by October 31, 2003, and file dispositive motions by November 17, 2003.

[¶ 28] On April 24, 2003, Ms. Cathcart filed a response to State Farm's summary judgment motion. In a supplemental response filed the day before the hearing, Ms. Cathcart asked the district court to deny the motion or refrain from ruling until further discovery was completed. In an affidavit attached to the supplemental response, counsel for Ms. Cathcart stated his experts were still in the process of formulating their final opinions for the June 27, 2003, expert designation deadline and other discovery likewise remained to be completed.

[¶ 29] In accordance with the scheduling order, the district court heard argument for and against the pending summary judgment motion on May 28, 2003. In its July 3, 2003, order, the district court reserved ruling on the summary judgment motion on the breach of contract claim and gave the parties additional time to file supplemental briefs. As of August 27, 2003, three months after the summary judgment hearing, Ms. Cathcart had filed no supplemental materials opposing the motion. Only then did the district court grant summary judgment for State Farm on the breach of contract claim. By that time, the case had been pending for fifteen months, State Farm's summary judgment motion had been pending for six months, one deadline for completion of discovery had been avoided as a result of the remand and Ms. Cathcart had been given an additional three months to file supplemental materials opposing summary judgment on the breach of contract claim. Under these circumstances, we are hard pressed to find error, particularly where the summary judgment at issue involves interpretation of clear contract language and little in the way of factual dispute.

[¶ 30] We have said that, ordinarily, discovery on issues which are the subject of a summary judgment motion should be allowed to be completed before the motion is scheduled, heard and decided. *Abraham v. Great Western Energy, LLC,* 2004 WY 145, ¶ 19–22, 101 P.3d 446, 454–55 (Wyo.2004). On that basis we held in *Abraham* that the district court abused its discretion when it denied a motion for continuance of a summary judgment hearing until discovery was completed. We said, "by scheduling the hearing on the motions for summary judgment before the deadline for discovery had passed and, thus, not allowing the Abrahams adequate time to prepare and file any other pertinent materials prior to that hearing, they were deprived of the protections to due process afforded by the applicable rules of civil procedure." *Id.* at 455.

[¶ 31] In contrast to the situation in *Abraham,* we conclude under the particular circumstances presented here that the district court's action in hearing the summary judgment motion before discovery was completed did not deprive Ms. Cathcart of adequate time to prepare or the opportunity to file additional materials. Additionally, Ms. Cathcart offers no evidence discovered after the summary judgment ruling to show the result might have been different if the district court had waited to rule. Under these facts, we can find no error.

### 2. Evidence of the Underlying Motor Vehicle Accident

[¶ 32] Given that her complaint against State Farm alleged bad faith, Ms. Cathcart contends the focus of the trial should have been the conduct of the insurance company and whether it fulfilled its duty to the insured. She asserts the district court erred in allowing evidence concerning the accident and her conduct in relation to it. She states:

> [O]nce [State Farm] determined that [she] was entitled to recover damages (as it did) and once the amount of damages [she] was entitled to recover (an amount in excess of the policy limit), the only remaining question was to determine if the conduct of [State Farm] conformed to the legal standard already established in Wyoming. Since [Ms. Cathcart] was entitled to recover damages in excess of the policy limit ($100,000.00) all that remained for the jury was to determine if the payment by [State Farm] to [her] of less than that amount ($75,000.00) met the duty of good faith and fair dealing.

By permitting State Farm to present evidence of her conduct and the accident, Ms. Cathcart contends, the district court improperly allowed those matters to become the focus of the trial, rather than State Farm's conduct.

[¶ 33] State Farm responds that the district court properly allowed evidence of the underlying accident to refute Ms. Cathcart's allegations of bad faith and unfair dealing. State Farm contends evidence of what it did to investigate, what it learned from the investigation and how that knowledge affected its evaluation of the claim was essential to refute Ms. Cathcart's claims that it acted unreasonably and that her claim was not fairly debatable. Without the ability to present that evidence, State Farm contends, it would have been unable to present a defense.

[¶ 34] We address Ms. Cathcart's argument summarily. As State Farm asserts, without the opportunity to present evidence concerning the underlying accident—what happened, who did what, what the witnesses saw, and what the accident investigation people concluded—State Farm would have had no defense to the claim that a reasonable insurer under the facts and circumstances would have handled the claim differently. In order to show that it acted reasonably and in good faith and dealt with Ms. Cathcart fairly, State Farm had to be allowed to present evidence concerning its investigation of the accident, its evaluation of the claim, and its actions in dealing with Ms. Cathcart and her parents. Whether a claim is "fairly debatable" necessarily implicates the question whether the facts necessary to evaluate the claim are properly investigated and developed or recklessly ignored and disregarded. *McCullough v. Golden Rule Ins. Co.,* 789 P.2d 855, 860 (Wyo.1990). Moreover, "[t]he logical premise of the debatable ... standard is that if a realistic question of liability does exist, the insurance carrier is entitled to reasonably pursue that debate without exposure to a claim of violation of its duty of good faith and fair dealing." *Gainsco Ins. Co. v. Amoco Production Co.,* 2002 WY 122, ¶ 33, 53 P.3d 1051, 1062 (Wyo.2002) (citations omitted). In order to show that Ms. Cathcart's claim was fairly debatable, State Farm was entitled to show that a realistic question concerning liability existed. That showing required evidence of the circumstances surrounding the underlying accident. The district court did not abuse its discretion in allowing evidence of the accident.

### 3. Evidence of Marijuana Use

[¶ 35] Ms. Cathcart also claims the district court abused its discretion in allowing evidence to be introduced at trial concerning a marijuana pipe found at the accident scene and statements that she used marijuana prior to the accident. She contends the evidence was inflammatory and irrelevant given the toxicology reports indicating she had not used marijuana on the day of the accident. State Farm responds that evidence concerning the pipe and alleged marijuana use was relevant because it was a factor considered in evaluating Ms. Cathcart's claim. The district court agreed that the evidence was relevant to show what information State Farm gathered and considered in evaluating the claim and ruled that it was admissible.

[¶ 36] All relevant evidence is admissible at trial; irrelevant evidence is not admissible. W.R.E. 402. Evidence is relevant if it has any tendency to make more or less probable the existence of any fact of consequence to determining the action. W.R.E. 401. State Farm's theory of defense was that its actions were reasonable given the factors weighing in favor of a determination that Ms. Cathcart's comparative fault was sufficient to preclude her from recovering uninsured motorist benefits or that her damages would have been reduced by her percentage of fault. One of those factors was the evidence of marijuana use in the car she was driving on the day of the accident. There is no question that evidence was relevant as that term is defined by our rules.

[¶ 37] However, the fact that the evidence was relevant is not always determinative of its admissibility. Even relevant evidence must satisfy W.R.E. 403, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

[¶ 38] As with other rulings on the admissibility of evidence, the district court's authority to exclude relevant evidence is discretionary in nature, as it is in a better position both to detect and to assess the dangers and considerations enumerated in the rule, and to balance these against the probative value of proffered evidence. *Banks v. Crowner*, 694 P.2d 101, 104 (Wyo. 1985). We find no abuse of discretion in the district court's determination that the probative value of the evidence at issue outweighed the danger of unfair prejudice. Our conclusion in this regard is bolstered by the fact that evidence was also presented showing the toxicology report results, which evidence further reduced the danger of unfair prejudice.

### 4. Juror Questions

[¶ 39] Ms. Cathcart claims the district court abused its discretion in allowing the jurors to submit proposed questions to be asked of witnesses because the questions were irrelevant, caused confusion and allowed the focus of the trial to be shifted away from her bad faith claim. This is the first time we have been asked to interpret W.R.C.P. 39.4, the rule that addresses juror questions. The rule provides as follows:

> At the beginning of civil trials, the court *shall* instruct jurors that they *will* be permitted to submit written questions for witnesses if they have questions about the witnesses' testimony that have not been answered after counsel for all parties have finished examining the witnesses. The court shall also instruct the jurors that some questions they submit may not be asked, as some jurors' questions may be legally improper or otherwise inappropriate. The court shall provide jurors with paper and a pen or pencil with which they may write down questions for submission to the court.
>
> Before each witness is excused, the court shall determine whether any jurors have questions for that witness. The court shall review jurors' written questions with counsel, out of the hearing of the jury, making the question part of the record. The court shall permit counsel to impose objections, including objections based on litigation strategy or stipulation of the parties. The court shall rule on any objections, noting the basis of the ruling on the record. *If the court determines that the question is not improper or unfairly prejudicial, the court shall read the question to the witness or permit counsel to read the question to the witness.* The question may be modified as deemed appropriate by the court in consultation with counsel. After the witness responds to the question, the court shall permit counsel for both sides to ask follow-up questions if such follow-up questions appear to be necessary or appropriate.
>
> The court shall permit counsel to present additional rebuttal evidence at trial if necessary to prevent unfair prejudice attributable to testimony that results from questions that jurors submit.

*Id.* (emphasis added).

[¶ 40] Pursuant to the mandatory language of this rule, the district court instruct-

ed the jurors before trial that they would be permitted to submit written questions to be asked of the witnesses. The court also informed the jurors that some of their questions might not be asked. The court informed the jurors of the procedure it would follow concerning their written questions. There is no indication from the record before this Court that Ms. Cathcart objected to the instruction or the procedure the district court imposed for complying with Rule 39.4.

[¶ 41] During the trial, the parties presented the testimony of 20 witnesses, four of whom testified by deposition. The jurors submitted written questions to the sixteen witnesses who appeared and testified live at trial. For those sixteen witnesses, the jurors submitted over 200 questions to the district court. In accordance with the mandatory language of the rule, the district court reviewed the jurors' questions with counsel outside the hearing of the jury. These conferences were not reported and therefore do not appear in the record. However, it appears from the record we do have that counsel and the district court decided outside the hearing of the jury that nine of the juror questions submitted would not be asked.[7] The district court then permitted counsel to impose objections to the questions on the record.

[¶ 42] Of the 200–plus questions submitted, counsel for Ms. Cathcart objected on the record to fifteen juror questions asked of State Farm witness Newell Knight, an accident investigator and reconstructionist hired by State Farm during the claims process to assist it in evaluating the claim by assessing the cause of the accident. Mr. Knight concluded that the accident was caused by Ms. Cathcart's high speed, inattention, inexperience and fatigue from driving an excessive number of hours, and testified to that effect at trial. The basis for Ms. Cathcart's objection to the jurors' questions of Mr. Knight was that they were irrelevant and immateri-

al. The district court overruled the objection and the following exchange occurred:

THE COURT: * * * Your report states that initial marks do not indicate that braking was occurring in response to a driver's suddenly changing lanes in front of the driver. Based on the evidence, do you have an opinion about the existence of a phantom driver?

THE WITNESS: Only to say that the marks that are there are not skid marks. That is a mark made by a driver coming back on. It does not indicate the skid mark; that is the best I can tell you.

THE COURT: Would your opinion be different about Ms. [Cathcart]'s experience if she had been driving—actually driving before she was of an age to be legally driving?

THE WITNESS: No.

THE COURT: Would this accident occur—have occurred if Ms. [Cathcart] was cut off by a phantom driver, even if she was going the speed limit?

THE WITNESS: The answer is yes. If you're driving the speed limit, you could still make a yaw mark[8]. You wouldn't make yaw marks of this magnitude.

THE COURT: What is the maximum number for drag factor?

THE WITNESS: The maximum number would be probably 1,000, which is a meshing gear. But we see drag factors on roads that exceed 1.5, which is a very slippery—rough road going up a grade of about 6 to 8 percent.

Q. Will the tire condition affect drag or yaw? [9]

THE WITNESS: No, no, once a tire starts to skid, it makes no difference even if it's a bald tire. It just wears out faster. In a yaw, the tire is folding down under. If the tire failed you would see distinctive marks, but it doesn't make any difference.

---

7. Roughly 185 of the written juror questions are marked "o.k.," nine are marked "no" and roughly 30 have no notation.

8. In his direct testimony, Mr. Knight testified that a yaw mark is "caused when hard steering is put into a car. And that car starts to turn.... It is not a skid by definition.... A car yaws when

you see these long, looping marks.... It's an input that causes the car to eventually go into a clock spring...."

9. It is not clear from the transcript whether the court or someone else asked this question.

594

THE COURT: Will weight of a vehicle affect yaw?

THE WITNESS: No, it will affect tip over, but not yaws.

THE COURT: Do you ever construct an accident when someone knows all the factors of an accident?

THE WITNESS: No.

THE COURT: How close is a reconstruction to the actual facts in a percentage?

THE WITNESS: In some cases you could be—you could be nearly 100 percent sure of everything that is there, speed, time, and distance, if everything is there and measured under the right conditions.

THE COURT: How far did the car slide or yaw before flipping?

THE WITNESS: The first mark recorded—and I'll just call it letter A. From the letter A to final position of the right rear is 653 feet, 9 inches, it looks like.

THE COURT: Okay, if you can, how many times have you worked for State Farm?

THE WITNESS: I bet I've worked for State Farm 500 times in 40 years, just off the top of my head. I bet it's 500 times out of many thousands.

THE COURT: How are reconstructionists selected?

THE WITNESS: Selected?

THE COURT: Yeah.

THE WITNESS: Well, they're selected by the people who decide to hire you. That is the first criteria, but how do you get the expertise, if that is the question. You get it through education, training, and experience. The way you're selected would be somebody calls and hires you, I guess is the best way to say it. But you get your background through education, experience, training, court testimony, veracity, truthfulness, all of those things.

THE COURT: If you don't work in Wyoming, typically, do you know why you were contacted?

THE WITNESS: I don't.

[Plaintiff's counsel]: Excuse me, Your Honor, I think he answered the question. I will object to any volunteering.

THE COURT: If you don't, that is—

THE WITNESS: I don't, Your Honor.

THE COURT: That is a sufficient answer. What was determined in the friction coefficient of the car, and is that indicative in figuring the speed?

THE WITNESS: It is, the friction coefficient is what you must have to determine how fast you can take a curve. On a slick road, if you have got an [ice] skating rink it's a .10. You can spin off very quickly. So the drag factor has to be considered of how you're sitting, squeezing the road is what it amounts to. If the drag factor goes low, you run off the road on a very long radius. But drag factor is part of the formula you have to have to find the—you take the middle ordinate to find radius, and once you find that's correct that has to be plugged in to how slick the road is. The greater the radius, the higher the speed, so drag factor is part of the equation. Part of the algebraic equation.

THE COURT: Do you have some formula that determines the drag factor?

THE WITNESS: I do. The drag factor—

THE COURT: Excuse me, I guess it's the coefficient of friction.

THE WITNESS: Drag factor coefficient of friction we use interchangeably. There is a little difference, but the formula is you take the weight of an object versus the amount of pull that it takes. So if I put a 100 pound block down on the road and it takes me 70 pounds to pull it, my drag is .7 to do it with a car. If I go 40 miles an hour, and I skid for 76 feet, my drag factor, is .7. But there is a specific mathematical formula that says the drag factor equals the speed squared, divided by 30, times the distance. But all you're doing in reality is taking a chart and you say, if I go this fast, if I skid this far, that is how slick the road has to be. That is all based on a simple math formula. But we do it with a drag sled, and we can do it with an actual test of vehicles.

THE COURT: Was your formula any different than the highway patrol's?

THE WITNESS: No.

THE COURT: Does the highway patrol or the department of transportation enforce the ten-hour limit for truck drivers?

THE WITNESS: You know, I—they better; that is all I can say. But I don't know. I haven't worked with port of entry since I retired from the highway patrol, but I assume that is an enforcement thing.

 [¶ 43] Applying the abuse of discretion standard we have adopted for claims of error under W.R.C.P. 39.4, we find nothing in the record before us to indicate that the district court failed to exercise sound judgment with respect to the juror questions or acted arbitrarily and capriciously. Ms. Cathcart points to no specific error or prejudice but challenges the rule itself by asserting that it is fundamentally unfair and prejudicial.

[¶ 44] Wyoming is among the majority of states that allow juror questioning. As one court has stated in a thorough review of the practice:

Juror questioning is neither radical nor a recent innovation. The practice was historically part of the trial process and considered a useful tool in ascertaining the truth.... Although a few courts have prohibited questioning of witnesses by juries, none have held it unconstitutional.

The vast majority of states that have ruled on the issue allow juror questioning in some form.

In addition to the state court decisions, of the ten federal circuits that have considered the juror questioning issue, all allow the practice in some form in the trial court's discretion.

[R]ecent decisions allow the trial courts greater freedom in utilizing juror questioning. Many decisions conclude that juror questioning of witnesses aids in the ascertainment of truth and the overall achievement of justice in trials. Other courts have found that juror questioning may also increase juror understanding and participation.

*.* *

In addition, scholarly and professional commentary is near unanimous in its support for allowing jurors to question witnesses.

*State v. Doleszny,* 2004 VT 9, ¶¶ 12–15, 18, 176 Vt. 203, 844 A.2d 773, 778 (2004) (citations omitted). Absent a showing of how the juror questions specifically prejudiced Ms. Cathcart's ability to present her claim, we find no abuse of discretion and affirm the district court's rulings.

**5. Jury Instructions**

[¶ 45] Ms. Cathcart's final contention is that the district court erred in giving certain jury instructions and not giving others. We consider first her claims of error in instructions given by the district court.

**a. Instructions Given**

 [¶ 46] First, Ms. Cathcart claims the district court erred in giving instruction 13A, which read as follows:

If you find that the Defendant did no more than simply delay payment, then in order to find a breach of the duty of good faith in the handling and investigation of the claim, you must find that State Farm acted intentionally and without justification and used deceit, non-disclosure, violation of industry custom, and/or made deliberate attempts to conceal the truth.

Ms. Cathcart asserts the instruction was improper because this was not a delayed payment case. State Farm responds that it was not error to give the instruction because testimony was presented that Ms. Cathcart's parents were pushing for a settlement and were frustrated at the amount of time it was taking. State Farm also cites to the following statement by Ms. Cathcart's counsel during closing argument:

What in God's creation had State Farm been doing from November 13th, until it actually did the assessment in February, February 25th, in the injury evaluation report? Not much.

Because Ms. Cathcart objected to the instruction, we consider first whether the district court erred in giving it. If we find

error, we then review the error for prejudicial effect. *Daley,* ¶ 29, 30 P.3d at 554.

[¶ 47] Given defense counsel's statement in closing argument and the evidence that Mr. and Mrs. Mesa wanted a settlement and were frustrated by the delay in getting one, we find no error in the district court's decision to instruct the jury on the law concerning delayed payment. Although the complaint did not specifically allege delayed payment as a basis for the bad faith claim, evidence and argument were presented suggesting that one of the ways in which State Farm acted in bad faith was by delaying payment. The instruction may have been unnecessary in this case, but we are not willing to say the district court erred in giving it.

[¶ 48] Ms. Cathcart also asserts the district court erred in instructing the jury that she and her parents had a duty to read the insurance policy. The instruction at issue stated as follows:

Instruction No. 16

Typically, an insured has a duty to read the insurance policy under which he or she is making a claim to determine the coverages available under the policy. If you find that the Plaintiff or her parents should have read the insurance policy in question and failed to do so, then you may consider such failure as evidence of their fault.

Ms. Cathcart claims this instruction misstated Wyoming law and prejudiced her case because it has never been held in Wyoming that an insured who is not a policyholder and not a party to the contract has a duty to read the policy. State Farm responds that whether or not the instruction accurately states Wyoming law, there was no prejudice from the instruction because the jury found State Farm did not breach the implied covenant of good faith and fair dealing or commit fraud. Therefore, State Farm asserts, the jury never reached the question of whether Ms. Cathcart was at fault for not reading the policy. Ms. Cathcart objected to instruction 16 during the instruction conference; therefore, we consider whether it was error to give the

instruction and, if so, whether the error was prejudicial.

[¶ 49] The law in Wyoming is that a policy holder has a duty to read his or her insurance policy. *Small v. King,* 915 P.2d 1192, 1194 (Wyo.1996); *Feather v. State Farm Fire & Casualty,* 872 P.2d 1177, 1181 (Wyo.1994); *Darlow v. Farmers Insurance Exchange,* 822 P.2d 820, 828–29 (Wyo.1991). We have also recognized that third-party beneficiary claims are subject to the same defenses as would be available in an action between the actual parties to the contract. *Cordero Mining Co. v. U.S. Fidelity and Guar. Ins. Co.,* 2003 WY 48, ¶ 28, 67 P.3d 616, 626 (Wyo.2003). Applying this rule in *Cordero,* we held that the insured's failure to read the policy could be used by the insurer to defend a claim against a third party beneficiary of the policy. We have not previously decided whether the duty to read defense available in an action brought by the policyholders also is available in an action brought by a non-policyholder insured. We find it unnecessary to reach an express holding on the issue because we conclude any error in giving the instruction under these facts was not prejudicial. We have said:

> In reviewing alleged errors in jury instructions, a finding of error alone is insufficient to reverse; prejudicial error must be found. Such error is never presumed and must, instead, be demonstrated by the party asserting error. To satisfy this burden, there must be a reasonable possibility that, in the absence of error, the verdict might have been more favorable to a party, and the burden is on the appellant to show whether the error is prejudicial.

*Daley,* ¶ 29, 30 P.3d at 554 (citations omitted). The jury in this case decided State Farm did not act in bad faith or commit fraud in investigating and handling Ms. Cathcart's claim, and never got to the question of whether Ms. Cathcart's failure to read the policy contributed to her alleged loss. Under these circumstances, it seems unlikely the verdict might have been more favorable to Ms. Cathcart in the absence of the duty to read instruction.

[¶ 50] We have also said:

When generally examining the propriety of jury instructions, this Court reviews all instructions as a whole. "On review, this Court considers whether the instructions, taken as a whole, adequately and clearly advise the jury of the applicable law."

We have said the function of jury instructions is to give the jury guidance regarding the law of the case. The trial court is not obligated to give an instruction offered by a party as long as the jury is adequately instructed on the law as it pertains to that case. The trial court's ruling on an instruction will not constitute reversible error absent a showing of prejudice, and prejudice will not be said to result unless it is demonstrated that the instruction confused or misled the jury with respect to the proper principles of law.

In past decisions, this Court has applied a five-factor test in measuring the degree of error that may be considered prejudicial. Those factors are:

(1) [t]he extent to which there is conflict in the evidence on critical issues;

(2) whether or not the ... argument to the jury may have contributed to the instruction's misleading effect;

(3) whether or not the jury requested a re-reading of the erroneous instruction or of related evidence;

(4) the closeness of the jury's verdict; and

(5) the effect of other instructions in curing the error.

*Daley,* ¶ 30, 30 P.3d at 555 (citations omitted)

■ [¶ 51] The evidence presented in this case showed that State Farm investigated the accident, learned that Ms. Cathcart was driving at a high rate of speed, learned also that the actions of another driver may have contributed to the accident, informed Ms. Cathcart's parents that uninsured motorist coverage might come into play, determined that Ms. Cathcart's own actions may

have had a significant role in the accident and, based upon an assessment of her likely percentage of fault, offered her $75,000 of the $100,000 available under the uninsured motorist provision. The evidence presented further showed that, accompanied by her father, Ms. Cathcart accepted payment of the $75,000 and signed a release relinquishing any further claims against State Farm as a result of the accident. Applying the first factor in the five part test for prejudicial error, there was no material conflict in the evidence on these critical issues.[10]

[¶ 52] In her closing argument to the jury, counsel for State Farm stated:

And then I think you have to look in light of that Instruction Number 16 that talks about what their duty is with regard to reading the policy to determine the coverage. And under the law an insured has a duty to read the insurance policy and determine the coverages. Mr. and Mrs. Mesa of course were not making the claim, but they were representing their daughter in making that claim. If there is any question in their mind as to what the policy limits were, what the coverage was, all they had to do was look at the policy. And they say, well, it wasn't our policy. It was my mother-in law's policy. Or, you know, all they had to do was ask the mother-in-law, could I have a copy of the policy. If she didn't have one, ask Rick Trujillo. I would have been happy to give her a copy of the policy. Go to Valerie Peak. She could have printed it out and would have been happy to do that.

Whether or not a non-policy holder insured has a duty under Wyoming law to read the policy, defense counsel's argument simply told the jury in essence that an insured, or the parents of a minor insured, have a duty to exercise reasonable care to examine the coverage obtained and act to avoid loss. *Feather,* 872 P.2d at 1181; *Moore v. Continental Ins. Co.,* 813 P.2d 1296, 1301 (Wyo.

10. The only disputed issue among these critical elements was whether State Farm informed Ms. Cathcart's parents the uninsured motorist provision applied. They initially testified they did not remember what they discussed with Mr. Trujillo. They later testified the applicability of the provi-

sion was not discussed. The attorney representing them at the time testified he was informed that it applied. Mr. Trujillo's notes reflect the issue was discussed. In any event, Ms. Cathcart ultimately accepted payment under the uninsured motorist provision.

1991). This is an accurate statement of Wyoming law. Therefore, applying the second of the five factors for determining prejudicial error, the argument to the jury did not contribute to any misleading effect instruction 16 may have had. Applying the third and fourth factors of the test, the jury did not request to have instruction 16 re-read and the jury verdict was unanimous. Considering the duty to read an instruction in light of the other instructions given, we conclude the instructions as a whole adequately and clearly advised the jury of the applicable law.

[¶ 53] Ms. Cathcart also argues the district court erred in giving instruction 17, which stated:

An insurer, as part of its duty of good faith, may have an obligation to inform the insureds of the extent of the coverage afforded them under their policy before negotiating a settlement. Whether this duty exists depends on the particular circumstances of the case. In determining whether State Farm had a duty to inform, you should consider the following factors, together with all other evidence in the case:

a) The type of insurance policy in question;

b) Whether it was apparent to the insurance company that the insured knew the extent of coverage;

(c) Whether there is a likelihood that the insured can only be compensated fully under her own policy; and

(d) Whether the insured has no basis to believe she must rely upon her policy for coverage.

These factors are not all inclusive nor must all be present or absent for the duty to inform to exist. If you find from your consideration of all the evidence that State Farm should have informed the Plaintiff of the coverage available under the policy but knowingly and recklessly failed to do so without any reasonable basis, then you may consider such failure as evidence of a breach of the duty of good faith.

Ms. Cathcart argues this instruction misstated Wyoming law because although it accurately states the law applicable in double-insurance situations (where both parties involved in an accident have liability coverage issued by the same insurer), it is not the applicable law in first party uninsured motorist cases like hers. She contends an insurer handling a first party uninsured motorist claim has an unconditional duty to inform the insured of the amount of the policy limits.

[¶ 54] In *Darlow*, 822 P.2d at 828, we adopted the Tennessee Rule for determining the obligations owed by an insurer:

Under this formulation, the duty of good faith and fair dealing includes informing an insured as to coverage and policy requirements when it is apparent to the insurer that (1) there is a strong likelihood that its insured only can be compensated fully under her own policy and (2) the insured has no basis to believe that they must rely upon their policy for coverage.

As Ms. Cathcart asserts, *Darlow* involved a double-insured situation, i.e., the Darlows and the owners of the other vehicle involved in the accident had automobile insurance coverage issued by the same insurance company. Since *Darlow*, we have considered an insurer's duty to inform in the context of uninsured motorist coverage and adopted a somewhat different standard.

[¶ 55] *Shrader*, 882 P.2d 813, was a first party uninsured motorist case. In *Shrader*, State Farm argued that it owed no duty of good faith and fair dealing to its insured under the policy's uninsured motorist provision. State Farm argued that a claim for uninsured motorist benefits should be treated as a third party claim until the liability of the uninsured motorist was determined. We disagreed, holding that an insurer providing uninsured motorist coverage owes a duty of good faith and fair dealing to its insured at all times. As we did in *Darlow*, we relied in *Shrader* on the Tennessee Supreme Court's decision in *MFA Mutual Ins. Co. v. Flint*, 574 S.W.2d 718 (Tenn.1978), which was also a first party uninsured motorist case. We cited with approval the *Flint* court's holding that as part of the duty of good faith and fair dealing, "an insurer ... is required to inform the insureds of the extent of the coverage afforded them under their policy before negotiating a settlement, especially when it is

apparent that the insured does not know the extent of available coverage." *Shrader,* 882 P.2d at 827. This is the standard applicable under Wyoming law that defines an insurer's duty to inform in first party uninsured motorist cases.

[¶ 56] The difficulty with the instruction the district court gave in Ms. Cathcart's case is that it suggested the duty to inform was conditioned upon factors, identified in *Darlow,* that are not applicable in the uninsured motorist coverage context. It also suggested the duty arises only when it is apparent to the insurer that the insured does not know the extent of coverage, instead of correctly stating that the duty always exists, especially when it is apparent the insured does not know the extent of coverage. Because instruction 17 was not a correct statement of Wyoming law, the district court erred in giving it to the jury.

[¶ 57] We turn to the question of whether the error was prejudicial. In making that determination, we apply the five factor test identified in *Daley:* (1) the extent to which the evidence was in conflict on critical issues; (2) whether or not the argument to the jury may have contributed to the instruction's misleading effect; (3) whether or not the jury requested a re-reading of the erroneous instruction or related evidence; (4) the closeness of the jury's verdict; and (5) the effect of other instructions in curing the error.

[¶ 58] Examining the first factor, the evidence was undisputed that State Farm had the responsibility to inform Ms. Cathcart and her parents of the extent of coverage. State Farm's training manual, which provided that "State Farm claims representatives must understand the need to advise the insured of all coverages available under the insurance contract," was admitted into evidence. Mr. Trujillo testified that it was his responsibility on all claims to explain "everything about" the coverage available under the policy. Other more senior State Farm representatives testified as well that insurance adjustors were required to inform the insured concerning the extent of coverage. This factor weighs in favor of a finding that the instruction was not prejudicial.

[¶ 59] Looking at the second factor, counsel for Ms. Cathcart appropriately argued to the jury that State Farm had a responsibility to inform Ms. Cathcart of the extent of coverage prior to entering into a settlement with her, including that the policy limits were $100,000. State Farm did not dispute that it was required to advise Ms. Cathcart concerning coverage. Neither party mentioned instruction 17 in closing argument. If anything, the evidence and argument presented to the jury countered any misleading effect of instruction 17.

[¶ 60] The third factor of the test for prejudicial error concerns whether the jury asked to have the erroneous instruction reread. Reading of the jury instructions apparently was not recorded, so there is no transcript for this Court to review in that regard; however, there is no indication anywhere else in the record or in the parties' arguments to this court that the jury requested the district court to re-read instruction 17.

[¶ 61] Factor number four, the closeness of the jury verdict, similarly suggests a lack of prejudice. Although the record before us does not reflect how long the jury deliberated, the record does indicate the jury asked no questions during deliberations. The jury rendered a unanimous verdict in favor of State Farm.

[¶ 62] The fifth factor concerns the effect of other instructions in curing the error. In addition to instruction 17, which in a backhanded way instructed the jury that State Farm had a duty to advise Ms. Cathcart and her parents about coverage if it was apparent they did not know the extent of coverage, the jury was also instructed concerning an insurer's duties under the Unfair Claims Practices Act. Instruction 13, which the district court gave to the jury, stated:

You are instructed that Wyoming law provides as follows:

Unfair claims settlement practices:

(a) A person is considered to be engaging in an unfair method of competition and unfair and deceptive act or practice in the business of insurance if that person commits or performs with

such frequency as to indicate a general business practice any of the following unfair claims settlement practices:

(i) Misrepresenting pertinent facts or insurance policy provision relating to coverages at issue; * * *

(vi) Not attempting in good faith to effectuate * * * fair and equitable settlements of claims in which liability has become reasonably clear;* * *

(x) Making claims payments to insured * * * not accompanied by a statement setting forth coverage under which the payments are being made; * * *

(xiv) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law * * * for the offer of a compromise settlement.

If you find that the Defendant violated one or more of the above provisions either knowingly or in reckless disregard of the above law, then you should consider such violation as evidence of bad faith.

This instruction informed the jury that State Farm had a duty to accurately represent pertinent facts and provisions relating to coverage, to set forth the coverage under which payments were made, and to reasonably explain the settlement in light of the policy provisions.

[¶ 63] Instruction 17 was not a correct statement of Wyoming law. However, in light of instruction 13 and the evidence and argument presented to show State Farm had a duty to inform Ms. Cathcart and her parents concerning the extent of coverage, we hold the error in giving the instruction was not prejudicial.

[¶ 64] Ms. Cathcart also contends the district court erred in instructing the jury on comparative fault. Instruction 27 stated as follows:

Your verdict in this case must be determined on the basis of the comparative fault of the parties. It will be necessary for you to determine the comparative fault, if any, of each of the parties involved in the occurrence. It also will be necessary for you to determine the total amount of damages, if any, sustained by the Plaintiff. Fault is defined as the breach of any of the duties as defined in these instructions which caused damage to the Plaintiff.

Your findings as to fault will affect the Plaintiff's recovery. It is my duty to explain how that may occur.

The Defendant's liability for damages is limited to the percentage of fault, if any, that you find is attributable to the Defendant.

The Plaintiff's recovery is reduced by the percentage, of any, of fault that you find is attributable to the Plaintiff. If you find that the Plaintiff's fault exceeds fifty percent (50%), the Plaintiff will not be entitled to recover any damages.

The verdict form provided to you includes spaces for you to record your determination of the parties' comparative fault on a percentage basis.

If you find that the Plaintiff was at fault in some percentage, do not make an adjustment to account for the percentage of fault you attribute to the Plaintiff when you record the total amount of the Plaintiff's damages on the verdict form. The judge—not the jury—is responsible for reducing the Plaintiff's recovery to account for the percentage of fault, if any, that the jury attributes to the Plaintiff.

In explaining the consequences of your verdict, I have not meant to imply that either the Plaintiff or the Defendant is at fault. That is for you to decide in conformity with these instructions.

Ms. Cathcart also claims error in the section of the verdict form allowing the jury to determine comparative fault.

[¶ 65] During the instruction conference, Ms. Cathcart objected to instruction 27 on the following grounds:

We believe it's inappropriate to apply a comparative fault standard in the circumstance of this case. It is confusing to the jury and does not comply with Wyoming law. It implies the jury may assign the fault percentages in the underlying accident. It also implies that the jury may consider comparative fault on the fraud

claim, which is also inappropriate under Wyoming law.

Ms. Cathcart also objected to the portion of the verdict form referencing comparative fault:

> We also object to numbers three and four of the verdict form regarding the fault of Carly Mesa and/or her parents. In this case—this is not a case of comparative fault for the breach of the covenants of good faith and fair dealing or fraud or the violation of statute. The fault of the plaintiff and/or her parents [does] not belong on this verdict form. It's an incorrect instruction to the jury to make them answer these questions, based upon the law of Wyoming.

State Farm argues that any error in giving the instruction was harmless since the jury never reached the comparative fault issue. Perfunctorily, State Farm also argues comparative fault is a proper matter for jury instruction in bad faith cases because this Court held in *Board of County Commissioners of Teton County v. Bassett*, 8 P.3d 1079, 1083–84 (Wyo.2000), that all species of culpable conduct are to be compared under Wyo. Stat. Ann. § 1–1–109 (LexisNexis 2005).

[¶ 66] We decline to address the latter argument. The issue of whether comparative fault is a proper matter for jury instruction in a bad faith case has not been placed squarely before us except in the most perfunctory manner and neither party adequately briefed or argued the issue. We leave the issue for a case in which the parties squarely raise it and adequately address it. We review the instruction complained of here for prejudicial error and hold that Ms. Cathcart has failed to meet her burden of proving prejudice from any error in the instruction.

[¶ 67] The jury was asked to decide first whether State Farm breached the implied covenant of good faith and fair dealing in investigating and handling Ms. Cathcart's claim. The jury answered "No." The jury was then asked to decide whether State Farm committed fraud in investigating and handling Ms. Cathcart's claim. Again, it answered "No." Upon answering "No" to these questions, the jury was instructed to sign the verdict form and notify the bailiff. Under these circumstances, where the jury concluded State Farm did not breach the covenant of good faith and fair dealing and never considered the comparative fault of Ms. Cathcart, we find no prejudicial error.

### b. Instructions Not Given

[¶ 68] Ms. Cathcart also contends the district court erred in not giving several of the jury instructions she offered. Ms. Cathcart's proposed instruction 26, which the district court declined to give, stated as follows:

> Even if State Farm had a fairly debatable reason for not paying the claim in the first place, i.e., its belief that the loss was the result of the negligence of Carly Mesa, it cannot proper[l]y go beyond a reasonable denial of the claim and engage in unreasonable or unfair behavior to gain an unfair advantage. A fairly debatable reason to deny a claim is not a defense against conduct that may flow from engaging in oppressive and intimidating claims practices.

In *Hatch v. State Farm Fire and Casualty Co.*, 842 P.2d 1089, 1099 (Wyo.1992), the homeowners' insurance case from which this language is taken, the insured presented evidence of a variety of oppressive and intimidating claims practices.[11] Ms. Cathcart alleged no comparable practices by State Farm. Moreover, the jury deciding Ms. Cathcart's case was instructed in instruction 11 that even if a claim is fairly debatable, an insurer may breach the implied covenant of good faith and fair dealing "by the manner in which it investigates, handles or denies the claim." This instruction adequately and accurately informed the jury concerning the

---

11. In *Hatch*, the insured presented evidence that, among other things, the insurer required them to file a 275 page inventory of items in the house at the time it burned (including the number of cornflakes in the cereal box and the amount of salt in the salt shaker), ousted them from their home and searched it several times without permission, and made them submit to repeated and lengthy interviews by rude and threatening representatives and other oppressive and intimidating conduct.

applicable law. We find no error in the district court's refusal to give proposed instruction 26.

[¶ 69] Ms. Cathcart's proposed instruction 30 stated as follows:

An insurance company may not ignore evidence that supports coverage, or just focus on those facts which justify denial of the claim. If it does so, it acts unreasonably toward its insured and breaks the covenant of good faith and fair dealing.

Ms. Cathcart cited case authority from other states in support of this instruction. Wyoming has not adopted a similar rule. The district court did not err in refusing the proposed instruction.

■ [¶ 70] Ms. Cathcart's proposed instruction 34 read as follows:

An insurer, as a part of its duty of good faith, is required to inform the insureds of the extent of the coverage afforded them under their policy before negotiating a settlement, especially when it is apparent that the insured does not know the extent of available coverage.

This language was taken directly from *Shrader* and, as we said previously in this opinion in discussing instruction 17, correctly states Wyoming law on an insurer's duty to inform in an uninsured motorist situation. We hold it was error for the district court not to give the instruction, but not prejudicial error. State Farm did not dispute that it had the duty to inform Ms. Cathcart and her parents of the extent of coverage and instruction 13 correctly informed the jury that State Farm had a duty to accurately represent pertinent facts and provisions relating to coverage, to set forth the coverage under which payments were made, and to reasonably explain the settlement in light of the policy provisions.

[¶ 71] Proposed instructions 35 to 37 read as follows:

### Instruction No. 35

If an insurer fails to inform the insureds of their right to compensation for past or future pain and suffering, future loss of earning capacity, or past or future loss of enjoyment as a result of the permanent injuries the insureds suffered, the insurer breaches the duty of good faith and fair dealing.

### Instruction No. 36

The duty of an insurer to act in good faith and fairly should be of the highest order in regard to claims arising under uninsured motorist coverage. The public interest in this coverage means that insurers should be obligated to exercise the greatest care and highest level of good faith and fair dealing.

### Instruction No. 37

The duty of good faith and fair dealing is the obligation that the insurer must act fairly and in good faith in discharging its contractual responsibilities. Where in so doing, it fails to deal fairly and in good faith with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may be a breach of the covenant of good faith and fair dealing.

■ [¶ 72] The language in proposed instructions 35–37 is taken almost verbatim from cases and other legal authorities cited by this Court in *Shrader*. Proposed instruction 35 paraphrases statements made by the Tennessee Supreme Court in *Flint*, 574 S.W.2d at 721. Proposed instruction 36 is taken from 2 Widiss, Uninsured and Underinsured Motorist Insurance § 20.4 at 161–62 (2nd ed.1992) as quoted in *Shrader*. Proposed instruction 37 is from *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 485, 510 P.2d 1032 (1973), which was also quoted in *Shrader*. While the statements from these authorities were cited with approval in *Shrader*, they do not represent holdings of this Court and it was not error for the district court to decline the proposed instructions. Moreover, taken as a whole, the instructions the district court gave to the jury adequately and clearly advised the jury of the law applicable to Ms. Cathcart's claim. Taken as a whole, the instructions given cannot be said to have confused or misled the jury with respect to the proper principles of

law. We find no error in the district court's refusal to give proposed instructions 35–37.

[¶ 73 Affirmed.