2007 WY 75

**COLORADO CASUALTY INSURANCE COMPANY, a Colorado corporation, Appellant (Defendant),**

v.

**Donald L. SAMMONS, Individually and as trustee of the Sammons Family Living Trust, Appellee (Plaintiff).**

No. 06–239.

Supreme Court of Wyoming.

May 10, 2007.

**462**

Representing Appellant: John A. Coppede of Hickey & Evans, LLP, Cheyenne, Wyoming; and Brian J. Spano and Stephen E. Csajaghy of Rothgerber Johnson & Lyons LLP, Denver, Colorado. Argument by Mr. Spano.

Representing Appellee: James W. Britt, Chris A. Mattison, Cathleen H. Heintz, and

Alan Epstein of Hall & Evans, L.L.C., Denver, Colorado. Argument by Ms. Heintz.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] The district court granted summary judgment to an insured on its contract claim against its insurer after a fire loss, granted summary judgment to the insurer on the insured's emotional distress claim, and denied summary judgment to both parties on the remaining claims. We will reverse the summary judgment based upon the contract claim because genuine issues of material fact exist. The summary judgment based upon the emotional distress claim was not appealed, and is not, therefore, before us for review. The summary judgment denials were not final appealable orders and we do not, therefore, have jurisdiction to review them.[1]

## FACTS

[¶ 2] The Buford Trading Post is a small gas station/convenience store located on Interstate 80 between Cheyenne and Laramie, Wyoming. It is owned by the Sammons Family Living Trust (Sammons). The Trading Post has existed at the same site, in one form or another, for nearly 150 years. At the time of the fire, it consisted of a log building constructed in the 1940s, manual gas pumps, and underground steel storage tanks.

[¶ 3] On August 17, 2003, a fire completely destroyed the Trading Post building and damaged the fuel dispensing system. Sammons filed a property damage claim with its insurer, Colorado Casualty Insurance Company (Colorado Casualty), under a replacement cost policy.[2] The policy provision that is central to the present controversy is Sub-

---

1. Even though this case involves the grant and denial of cross motions for summary judgment, the denials are not appealable because they are not simply denials of counter motions based upon the same issue, the result of which would be complete disposition of the case. Rather, they involve issues beyond the breach of contract issue upon which summary judgment was granted. *See Gilstrap v. June Eisele Warren Trust*, 2005 WY 21, ¶ 7, 106 P.3d 858, 861 (Wyo.2005); *Lee v. LPP Mortgage Ltd.*, 2003 WY 92, ¶ 7, 74 P.3d 152, 157 (Wyo.2003); *Hutchins v. Payless Auto Sales, Inc.*, 2002 WY 8, ¶ 6, 38 P.3d 1057, 1059 (Wyo.

2002); *McLean v. Hyland Enters., Inc.*, 2001 WY 111, ¶¶ 16–20, 34 P.3d 1262, 1267–68 (Wyo. 2001).

2. As its title suggests, a replacement cost policy insures not just the actual or market value of the property at the time of a loss, but also the cost of replacement. In effect, replacement cost insurance insures depreciation. Leo John Jordan, *What Price Rebuilding?*, 19 ABA BRIEF, Fall 1990, at 17.

section 6 of Section E, which reads in pertinent part as follows:

### E. Property Loss Conditions

### 6. Loss Payment

In the event of loss or damage covered by this policy:

    a. At our option, we will either:

        (1) Pay the value of lost or damaged property;

        (2) Pay the cost of repairing or replacing the lost or damaged property;

        (3) Take all or any part of the property at an agreed or appraised value; or

        (4) Repair, rebuild or replace the property with other property of like kind and quality, subject to d.(1)(e) below.

. . . .

    d. Except as provided in (2) through (8) below, we will determine the value of the Covered Property as follows:

        (1) At replacement cost after application of the deductible without deduction for depreciation, but not more than the least of the following amounts:

        (a) The full cost of replacement of such property at the same site with new material of like kind and quality; or

        (b) The cost of repairing your property within reasonable time; or

        (c) The Limit of Liability that applies to the property shown in the Declarations; or

        (d) The amount actually and necessarily expended in repairing or replacing said property or any part thereof.

    We shall not be liable for payment of loss on a replacement cost basis unless and until actual repair is completed.

    You may elect not to repair or replace the damaged property. In this event, loss settlement shall be made on an actual cash value basis instead of a replacement cost basis. Should you elect this option, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

[¶ 4] Colorado Casualty determined certain damage valuations after the fire: (1) an actual cash value (ACV) of $215,489.71 for the building; (2) a replacement cost value (RCV) of $307,400.18 for the building; and (3) an RCV of $38,189.00 for the damaged portions of the fuel dispensing system. Consistent with the terms of the policy, Colorado Casualty paid Sammons $215,489.71 for the building's ACV, retaining a "depreciation holdback" of $91,910.47 ($307,400.18 less $215,489.71) pending rebuilding.[3] In addition, because Sammons had already contracted to have extensive work done to the fuel dispensing system, Colorado Casualty used the bid documents received by Sammons to pay beyond its estimated RCV for the fuel dispensing system, eventually sending Sammons two checks, one for $71,008.49, and another for $12,274.51, for a total of $83,283.00. Colorado Casualty conceded at oral argument that this $83,283.00 figure represents the RCV for the fuel dispensing system.

[¶ 5] The present controversy arose because Sammons did not replace the building and the fuel dispensing system by spending the damage valuation amounts determined by Colorado Casualty, nor did it replace the destroyed building or damaged fuel dispensing system with similar configurations. Instead, Sammons constructed a smaller building at a cost of only $210,443.76, and then spent $139,137.09 for a fuel dispensing system with automated pumps and PVC storage tanks, $22,635.15 for a canopy over the gas pump islands, and $20,998.57 to pave the parking lot. At that point, Colorado Casual-

---

**3.** A primary feature of replacement cost insurance is that the insurer is not obligated to pay beyond the basic policy amount—usually the actual cash value of the lost or damaged property—until such time as the insured has completed repair or replacement of that property. *See Burton v. Republic Ins. Co.,* 845 A.2d 889, 899 (Pa.Super.Ct.2004); *State Farm Fire & Cas. Co.*

*v. Patrick,* 647 So.2d 983, 983 (Fla.Dist.Ct.App. 1994) (*per curiam*); *Hess v. North Pac. Ins. Co.,* 122 Wash.2d 180, 859 P.2d 586, 589 (Wash. 1993). As will be seen later in this opinion, one obvious reason for that requirement is that the amount of the insurer's liability cannot be determined until repair or replacement has occurred.

ty had paid Sammons $298,772.71, and Sammons had spent $393,214.57. The policy's maximum value was $429,266.00.

[¶ 6] On June 17, 2004, Sammons' agent demanded that Colorado Casualty pay Sammons the $91,910.47 depreciation holdback. Colorado Casualty refused, on the ground that Sammons had not even spent the building's estimated ACV of $215,489.71, much less the RCV of $307,400.18 from which the depreciation holdback had been calculated, and that the amount Sammons actually expended in replacing the damaged property was less than the RCV estimates. Sammons then filed a consumer complaint against Colorado Casualty with the Wyoming Department of Insurance, seeking a determination that Colorado Casualty had wrongfully withheld the depreciation holdback. The Department ruled in favor of Colorado Casualty, concluding that neither the policy nor Wyoming law prevented Colorado Casualty from separately adjusting the building and the fuel dispensing system. In other words, Colorado Casualty only had to pay the building's ACV, because Sammons had not spent more than that amount on the building, even though he had spent more than the fuel dispensing system's RCV for changes and improvements to that system.

[¶ 7] On May 2, 2005, Sammons filed a Complaint against Colorado Casualty in district court, alleging breach of contract, violation of the implied covenant of good faith and fair dealing, and unfair claims practices under Wyo. Stat. Ann. § 26–13–124 (LexisNexis 2003), and seeking attorney's fees and penalties under Wyo. Stat. Ann. § 26–15–124 (LexisNexis 2003).[4] Both parties filed motions for summary judgment. Colorado Casualty filed first, with its central hypothesis being that the policy only required it to pay

Sammons the depreciation holdback amount if he did, indeed, replace the building at a cost in excess of the ACV. In its cross-motion, Sammons took the position that all of its expenditures were necessary to replace the building and fuel dispensing system, and that those expenditures should be combined as one amount under the "building" section of the policy, with a resultant single RCV. More specifically, Sammons contended that, once Colorado Casualty determined the replacement value of the building and fuel dispensing system, it had to pay him that total amount whether he spent it replacing the building or refurbishing the fuel dispensing system.

[¶ 8] The district court concluded that Sammons was correct as to two major points: first, that in making RCV estimates, Colorado Casualty could not separate the store claim from the fuel dispensing system claim because both were covered under the single "Buildings" portion of the policy; and second, once the RCV amount was established as the *value* of the loss, the *manner* of rebuilding was up to Sammons.

## ISSUES

[¶ 9] The parties have presented numerous issues, with some duplication. The following issues are dispositive:

1. Does the policy provide an unambiguous method of calculating the amount Colorado Casualty owes Sammons?

2. Are there genuine issues of material fact concerning the amount Colorado Casualty owes Sammons?

## STANDARD OF REVIEW

[¶ 10] Summary judgment motions are governed by W.R.C.P. 56, and the disposition

---

4. Four days later, Sammons filed what appears to be an identical document entitled "Amended Complaint." Although the index to the court file shows that Colorado Casualty subsequently filed an "Answer to Second Amended Complaint," no "Second Amended Complaint" is in the record on appeal, except that a non-file-stamped copy of such a document, dated July 11, 2005, is appended to the Notice of Appeal. The general allegations and the causes of action contained in the "Second Amended Complaint" appear to repeat those stated earlier, and the parties have pointed

out no substantive differences. Colorado Casualty's brief contends that the district court granted Sammons leave to file this "Second Amended Complaint" on October 18, 2005, and that it "became the operative pleading for purposes of this appeal." Nevertheless, the district court's Decision Letter makes reference only to the original Complaint in addressing the causes of action subject to the cross motions for summary judgment. Because of this imprecision in the record, we are left simply to assume that there are no substantive differences among these pleadings.

of such motions is guided particularly by the following language found in subsection (c) thereof:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

[¶ 11] In reviewing the grant of a summary judgment, we apply the following well-known standard of review:

> We examine the record from the vantage point most favorable to the party who opposed the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. We evaluate the propriety of a summary judgment by employing the same standards and by using the same materials as were employed and used by the lower court. We do not accord any deference to the district court's decisions on issues of law.

*Trabing v. Kinko's, Inc.*, 2002 WY 171, ¶ 8, 57 P.3d 1248, 1252 (Wyo.2002) (internal citations omitted).

## DISCUSSION

[¶ 12] We will begin this analysis by restating the principles of law we apply in reviewing insurance policy disputes:

> An insurance policy constitutes a contract between the insurer and the insured. As with other types of contracts, our basic purpose in construing or interpreting an insurance contract is to determine the parties' true intent. We must determine intent, if possible, from the language used in the policy, viewing it in light of what the parties must reasonably have intended. The nature of our inquiry depends upon how clearly the parties have memorialized their intent. Where the contract is clear and

unambiguous, our inquiry is limited to the four corners of the document.

> We interpret an unambiguous contract in accordance with the ordinary and usual meaning of its terms. The parties to an insurance contract are free to incorporate within the policy whatever lawful terms they desire, and the courts are not at liberty, under the guise of judicial construction, to rewrite the policy. It is only when a contract is ambiguous that we construe the document by resorting to rules of construction. Whether a contract is ambiguous is a question for the court to determine as a matter of law.

> A contract is ambiguous if indefiniteness of expression or double meaning obscure the parties' intent. Ambiguity cannot be created by the subsequent disagreement between the parties regarding the meaning of a contract. If the meaning of a provision in a contract is not readily apparent, the court may resort to competent evidence of extraneous circumstances to determine the parties' intent. Reviewing courts are free to make a determination as to the existence of ambiguity whether or not the parties agree one way or the other and whether or not the trial court has reached a conclusion one way or the other.

*Cathcart v. State Farm Mut. Auto. Ins. Co.*, 2005 WY 154, ¶ 18, 123 P.3d 579, 587 (Wyo. 2005) (quoting *Principal Life Ins. Co. v. Summit Well Serv.*, 2002 WY 172, ¶¶ 17–19, 57 P.3d 1257, 1261–62 (Wyo.2002) (citations omitted)).

[¶ 13] We agree with the district court and the parties that the policy, in its pertinent provisions, is unambiguous.[5] The confusion in this case arises not from any ambiguity in the policy, but from the fact that the parties and the district court did not clearly follow the two-step process established in the policy for determining the amount Colorado Casualty was to pay Sammons.[6] That pro-

---

5. Other courts concur. *See, e.g., Burton,* 845 A.2d at 894.

6. Thus, the loss settlement provisions are best viewed as separate and apart from the requirement in these policies that liability of the compa- ny beyond actual cash value loss does not occur until actual repair or replacement is completed. It is best to apply a two-part analysis. Viewed in this manner, first, the company's liability for additional funds is established if the insured

cess should have been as follows: First, under Subsection 6.a., Colorado Casualty had the option whether to (1) pay the value of lost or damaged property; (2) pay the cost of repairing or replacing lost or damaged property; (3) take the lost or damaged property at an agreed or appraised value; or (4) repair, rebuild or replace the lost or damaged property with property of like kind and quality. In the present case, Colorado Casualty took the second option of paying the cost of replacing the lost or damaged property. Therefore, the other options are irrelevant.

[¶ 14] Once Colorado Casualty determined that it would *pay* Sammons the cost of replacing the lost or damaged property, Subsection 6.d. of the policy provided alternative methods for *valuing* the lost or damaged property, and limited Colorado Casualty's payment liability to the least of those amounts. That evaluation is the second step in loss settlement analysis. Colorado Casualty's first option under the policy was to pay the full cost of replacement of the lost or damaged property at the same site with new material of like kind and quality. Using Colorado Casualty's RCVs of $307,400.18 for the building and $83,283.00 for the fuel dispensing system, that combined figure would be $390,683.18, which is the amount the district court determined Colorado Casualty owed Sammons. The opinion of the Wyoming Department of Insurance was, to the contrary, that the building and the fuel dispensing system could be adjusted separately, leading to a total figure of $298,772.71 ($215,489.71 plus $83,283.00).

[¶ 15] Colorado Casualty's second option was to pay the cost of repairing the lost or damaged property. This option was not exercised because the building was damaged beyond repair, and Sammons replaced the fuel dispensing system rather than repair it. No dollar estimate for total repair costs appears in the record. This option is irrelevant.

[¶ 16] Colorado Casualty's third option was to pay policy limits, that figure being

$429,266.00 at the time of the fire. This figure was not adopted, of course, because it was the highest. Sammons did not argue below, and does not now argue, that Colorado Casualty was obligated to pay policy limits. This option is irrelevant.

■ [¶ 17] Colorado Casualty's fourth option under the policy was to pay the amount "actually and necessarily" expended in replacing the lost or damaged property. Indeed,

> this subparagraph relates to a situation where the damaged property is repaired or replaced in a manner not identical with the original structure, but intended for the same occupancy and use. In such situation, if the amount actually expended is less than the replacement cost of the original building, the company's liability is limited to the amount actually expended.

*Ruter v. Northwestern Fire & Marine Ins. Co.,* 72 N.J.Super. 467, 178 A.2d 640, 643 (N.J.Super.Ct.App.Div.1962). That is the situation in this case, and therein lies this controversy. The ACV's and RCV's relevant under the first option are irrelevant under this option. The provisions and limitations of one subsection are not to be read into another subsection. *Blanchette v. York Mut. Ins. Co.,* 455 A.2d 426, 427–28 (Me.1983). Rather, the focus here is upon what expenditures were "actually and necessarily" made. In effect, that has been Colorado Casualty's argument throughout this litigation. Colorado Casualty concedes that Sammons actually expended $210,443.76 to replace the building and does not contest the necessity of that expenditure. Further, Colorado Casualty recognizes $83,283.00 of what Sammons spent on the fuel dispensing system as being necessary for replacement purposes, for a total "actual and necessary" replacement expenditure of $293,726.76. Having already paid Sammons $298,772.71, Colorado Casualty contends that it has more than fulfilled its policy obligations.

■ [¶ 18] Sammons, on the other hand, has presented this case from the beginning

---

completes the repair or replacement. The amount of its liability, as the second question however, is to be determined from a review of the loss settlement provisions.

Jordan, *supra* note 2, at 39.

as if the only question is whether Colorado Casualty can separate the RCV's for the building and the fuel dispensing system, thus preventing Sammons from spending the building's depreciation holdback on upgrades to the fuel dispensing system, plus a canopy and a paved parking lot. While Colorado Casualty has responded to this contention by pointing out that there is no policy provision that prevents such RCV separation, its fundamental argument has been that Sammons wants to be paid for costs that were not necessary to replace lost or damaged property. We agree with Colorado Casualty. The liability limitations in the policy clearly restrict the otherwise broad concept of "replacement cost coverage." *Davis v. Allstate Ins. Co.*, 781 So.2d 1143, 1144–45 (Fla.Dist. Ct.App.2001); *Estes v. State Farm Fire & Cas. Co.*, 358 N.W.2d 123, 124–25 (Minn.Ct. App.1984). Such limitations should be enforced where they are clearly stated. *Higgins v. Insurance Co. of North America*, 256 Or. 151, 469 P.2d 766, 774 (Or.1970); *see also State Farm Fire & Cas. Co. v. Patrick*, 647 So.2d 983, 984 (Fla.Dist.Ct.App.1994). Furthermore, Sammons can point to no policy provision that requires Colorado Casualty to adjust the claim by finding a single RCV for all items of damaged property. Keeping in mind that replacement cost insurance is, in effect, depreciation insurance, and that depreciation may affect different items of property differently, there is no logical reason for this court to import a term into the policy—even if it were at liberty to do so, which it is not—requiring Colorado Casualty to lump all property together for the purpose of determining an RCV.[7]

■■■ [¶ 19] Given that Colorado Casualty's obligation is only to pay the *least* of certain measured amounts, there are only two possibilities under the present facts. Either Colorado Casualty should have paid the RCV amounts upon replacement of the property "with new material of like kind and quality," or Colorado Casualty should have paid the actual and necessary amounts expended to replace the property, whichever amount is least. The RCV and ACV compu-

tations are set forth above. The actual and necessary amount expended was some figure between $293,726.76 ($210,443.76 plus $83,283.00) and $393,214.57 ($210,443.76 plus $139,137.09 plus $22,635.15 plus $20,998.57). The problem is that the district court made this decision as a matter of law when it is in actuality a question of fact. The fact finder must determine how much of the $182,770.81 spent otherwise than on the building was necessarily spent to replace lost or damaged property.

[¶ 20] Courts appear uniformly to have found the term "replace," as used in the policy, to be unambiguous, and have thus given it its standard dictionary definition:

> The dictionary definition of "replace" is: "1: to place again: restore to a former place, position, or condition 2: to take the place of: serve as a substitute for or successor: succeed, supplant 3: to put in place of: provide a substitute or successor for 4: to fill the place of: supply an equivalent for." (*Webster's Third New Internat. Dict.* (1968) p. 125.)

*Conway v. Farmers Home Mut. Ins. Co.*, 26 Cal.App.4th 1185, 1191, 31 Cal.Rptr.2d 883 (Cal.Ct.App.1994). A similar definition of the term can be found in *Huggins v. Hanover Ins. Co.*, 423 So.2d 147, 150 (Ala.1982):

> In the absence of a definition within the insurance policy and in the further absence of Alabama case law defining "replacement," the term must be given its common interpretation. [Citation omitted.]

> Replace means "to take the place of esp. as a *substitute* or successor" or "to put something new in the place of." *Webster's New Collegiate Dictionary*, G. & C. Merriam Co. (1974). (Emphasis added.)

*See also* Johnny Parker, *Replacement Cost Coverage: A Legal Primer*, 34 Wake Forest L.Rev. 295, 315 (1999).

■■■ [¶ 21] These definitions are consistent with the concept that "if the damaged building be replaced with a more expensive structure even though intended for the same

---

7. In a somewhat similar setting in *Burton*, 845 A.2d at 896–97, it was noted that "line-item pricing" is a generally accepted means of esti-

mating value in the insurance industry and may be implemented even if not expressly so provided in the policy.

occupancy and use, the company's liability is limited to the replacement cost of the old building." *Ruter*, 178 A.2d at 643. Similarly, it is the nature of replacement cost insurance that, if an insured spends less for replacement than the actual cash value of the loss, he or she is not entitled to replacement cost coverage amounts. *Patrick*, 647 So.2d at 984; *Kolls v. Aetna Cas. & Sur. Co.*, 378 F.Supp. 392, 397 (S.D.Iowa 1974), *aff'd* 503 F.2d 569 (8th Cir.1974); *Higgins*, 469 P.2d at 771–72. While we agree with the district court that Sammons could reach the replacement cost coverage of the policy by replacing the lost or damaged property with its functional equivalent, rather than having to construct identical facilities, we do not believe that such equates to a requirement that Colorado Casualty pay any more than the amount "necessarily expended to replace the lost or damaged property." Once again, the latter is the measure of Colorado Casualty's liability if it is less than the amount owed via RCV and ACV computations.

[¶ 22] The word "necessarily," like the word "replace," is not defined in the policy. The word is not ambiguous, and it is not a term of art in the industry, so we will ascribe to it its common meaning. According to *Webster's Third New International Dictionary* 1510 (2002), "necessarily" means:

> 1: in such a way that it cannot be otherwise; of necessity; INEVITABLY, UNAVOIDABLY .... 2: as a necessary result or consequence....

In turn, the word "necessary" is defined by the same source as:

> 1a: that must be by reason of the nature of things; that cannot be otherwise by reason of inherent qualities; that is or exists or comes to be by reason of the nature of being and that cannot be or exist or come to be in any other way; that is determined and fixed and inevitable....

*Id.*

[¶ 23] The concept of "necessarily" invokes the concept of a lack of choice. For the most part, what is "necessary" in this policy context is a question of fact. For instance, whether or not a change made for marketplace reasons was necessary must be determined by the fact finder, with the insured bearing the burden of proof in such regard. "Marketplace needs" was one of Sammons' justifications for the changes made to the Trading Post, and he should be required to prove that his facilities could not be replaced without meeting those marketplace needs. The same can be said about any requirement by the Wyoming Department of Environmental Quality, or other law or ordinance, that Sammons remove or install particular equipment. The district court found that "Sammons' replacement of the steel tank with pvc tanks, the steel reinforced paving laid over the underground tanks, the tank monitors, and other updated features were required by Wyoming law." If that were a fact, we could perhaps agree with the district court that such additions were necessary expenditures under the policy, as a matter of law.[8] Unfortunately, the record does not reflect that this fact was clearly established. Indeed, Colorado Casualty insists that just the opposite is shown as true. Consequently, a genuine issue of material fact exists.

[¶ 24] We do note, and in this regard we agree with the district court, that Subsection 6.d(1)(d), unlike Subsection 6.d(1)(a), does not require replacement of lost and damaged property with "new material of like kind and quality." That does not mean, however, that an insured can change the measure of the insurer's liability by replacing one sort of property with another. *See Davis*, 781 So.2d at 1144 (explaining the difference between the measurement of replacement cost value and the insured's subsequent use of the funds). The measure remains the same: the amount "actually and necessarily expended" replacing the property. Whether an amount was expended to replace damaged property, or was expended to add something that was not there before the fire, is a question of fact. Applied to the facts of this case, what that means is that Sammons could rebuild the

---

**8.** Although there is policy language concerning the effect of laws and ordinances, neither party has pointed us directly to a policy provision that covers the payment or non-payment of such expenditures.

facilities as he saw fit, but any expenditure that went beyond a replacement cost was his to bear.[9] The effect of the district court's ruling was to delete from the policy the provisions of Subsection 6.d.(1) allowing Colorado Casualty to pay for replacement at the least value proven by the facts.

## CONCLUSION

[¶ 25] The summary judgment granted to Sammons must be reversed because genuine issues of material fact remain for determination by a fact finder. Colorado Casualty's liability under the policy must be determined through application of the two-part valuation and payment process described in the policy.

Because Sammons did not replace the lost and damaged property according to the ACV and RCV estimations, a fact finder must determine the value of that part of the new construction that was necessarily expended to replace the lost and damaged property.

[¶ 26] Reversed and remanded for further proceedings consistent herewith.

9. One point of contention, for instance, is the replacement of manual gas pumps with fully automated gas pumps. If manual gas pumps are no longer available for installation, or are impractically expensive, or have been legally banned, Sammons could show that it was necessary to replace them with automated pumps. Similarly, if Sammons proved, for instance, that he was required by law to pave his parking lot, that could show necessity for that expenditure.