Jeffrey David **BURTON** and Terri L. Burton, on Behalf of Themselves and All Others Similarly Situated, Appellants,

v.

**REPUBLIC INSURANCE COMPANY, Appellee.**

Superior Court of Pennsylvania.

Argued April 30, 2003.
Filed March 16, 2004.

Ellen M.M. Doyle, Pittsburgh, for appellant.

Bryan J. Smith, Pittsburgh, for appellee.

BEFORE: JOYCE, TODD and BOWES, JJ.

OPINION BY BOWES, J.:

¶ 1 Appellants, Jeffrey and Terri Burton, appeal on behalf of themselves and others similarly situated from the judgment entered on the verdict on October 22, 2002, after the trial court, sitting without a jury, found in favor of Appellee, Republic Insurance Co. We affirm.

¶ 2 Appellee is licensed to sell homeowners' insurance within Pennsylvania, and it sold a homeowners policy with a personal property endorsement to Appellants. On October 28, 1993, Appellants suffered a substantial loss to their home and personal property as a result of a fire at their residence. Appellee estimated the cost to repair the home at $114,924.70, and after deducting depreciation of $14,051.02, it paid Appellants $100,219, representing the actual cash value of the repairs. Once Appellants completed the repairs, Republic paid an additional $11,709.37 reflecting the withheld depreciation. Appellants did not repair certain items contemplated in the estimate and performed additional construction without authorization. Since the finished home strayed from the specifications in the estimate, Appellee retained the $2,341 balance. Notwithstanding the alterations, Appellants assert that they are entitled to the $2,341 balance under the terms of the insurance policy.

¶ 3 In addition, Appellants submitted a personal property claim with an extensive inventory of damaged property. Appellee issued $49,785.25 on the claim, the actual cash value of the property loss, and withheld the depreciated value. After Appellants provided Appellee with supplemental information, Appellee paid an additional $4,504.11. Appellants assert that Appellee improperly continued to withhold $979.82 for property that Appellants could not demonstrate they replaced with items of like kind and quality.

¶ 4 On October 26, 1994, Appellants initiated this matter by filing a class action complaint against Appellee alleging that it had denied them the full benefit of property insurance coverage. On October 3, 1996, the court of common pleas certified this matter as a class action. The court defined the class as follows:

All Pennsylvania insureds with homeowners policies issued by Republic who have suffered a residential dwelling loss or a personal property loss on or after October 26, 1993[,] and who have been or are being denied the difference between the actual cash value of their residential or personal property and the replacement or repair cost or such property pending completion of the repair or replacement.

Trial Court Opinion, 10/03/96, at 1.

¶ 5. On April 12, 1999, the trial court granted partial summary judgment in favor of Appellee dismissing two counts of Appellants' complaint regarding unconscionable insurance contracts and the alleged breach of the duty of good faith and fair dealing. The court also denied Appellants' cross-motion for summary judgment. The case proceeded to a bifurcated trial on the remaining breach-of-contract claim, and on June 7, 2002, the trial court found that Appellee was not liable to the class members for additional benefits. This appeal followed.

¶ 6 Although articulated differently in Appellants' brief, the issues before this Court essentially are whether the terms of Republic's insurance policy concerning re-

placement costs are ambiguous or unconscionable, and whether Republic's practice of requiring claimants to replace the lost property with property of like kind constitutes a breach of contract.

¶ 7 As with all questions of law, our review of an insurance contract is plenary. *Cresswell v. Pennsylvania National Mutual Casualty Insurance Co.*, 820 A.2d 172 (Pa.Super.2003). In interpreting the terms of an insurance contract, we examine the contract in its entirety, giving all of the provisions their proper effect. *Riccio v. American Republic Insurance. Co.*, 550 Pa. 254, 705 A.2d 422 (1997). Our goal is to determine the intent of the parties as exhibited by the contract provisions. *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 469 A.2d 563 (1983). In furtherance of our goal, we must accord the contract provisions their accepted meanings, and we cannot distort the plain meaning of the language to find an ambiguity. *Tyler v. Motorists Mutual Insurance Co.*, 779 A.2d 528 (Pa.Super.2001). Moreover, we will not find a particular provision ambiguous simply because the parties disagree on the proper construction; if possible, we will read the provision to avoid an ambiguity. *Id.*

¶ 8 Appellants level several arguments contending that the terms of the insurance policy and the personal property endorsement were ambiguous and therefore should be construed against Appellee. An ambiguous contract is one that is subject to two or more constructions. *Gamble Farm Inn, Inc. v. Selective Insurance Co.*, 440 Pa.Super. 501, 656 A.2d 142 (1995). As Appellants note, we construe an ambiguous insurance provision against the insurer. *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Insurance Co.*, 825 A.2d 641 (Pa.Super.2003).

¶ 9 With these principles in mind, we examine the relevant portions of the insurance policy, which provide as follows:

**Loss Settlement.** Covered property losses are settled as follows:

. . . .

b. Buildings under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

(1) If, at the time of the loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

(a) The limit of liability under this policy that applies to the building;

(b) The replacement cost of that part of the building damaged for like construction and use on the same premises; or

(c) The necessary amount actually spent to repair or replace the damaged building.

. . . .

(4) **We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.** Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b.(2) above.

Homeowner Broad Form, at 8–9 (emphasis added). In addition, the personal property endorsement provides, in pertinent part, as follows:

**Replacement Costs**

The following loss settlement procedure applies to all property insured under this endorsement:

a. We will pay no more than the least of the following amounts:

(1) Replacement cost at the time of loss without deduction for depreciation;

(2) The full cost of repair at the time of the loss:

b. When the replacement cost for the entire loss under this endorsement is more than $500, **we will pay no more than the actual cash value for the loss or damage until the actual repair or replacement is complete.**

c. You may make a claim for loss on an actual cash value basis after the loss for any additional liability in accordance with this endorsement.

All other provisions of this policy apply. Personal Property Endorsement, at 1 (emphasis added).

¶ 10 Appellants contend that the phrase "actual cash value" is ambiguous because the policy does not define it, and it otherwise lacks an accepted meaning outside of the insurance industry. Appellants further assert that although Appellee purportedly interprets the phrase to mean replacement cost minus depreciation, it attributes different meanings to the phrase when referring to claims for items that do not depreciate such as antiques and collectors' items.

■ ¶ 11 Since the crux of Appellants' contention is that the insurance policy is ambiguous with respect to the deduction and withholding of depreciation until a claimant completes actual repair or replacement, our focus is not limited to the definition of a single phrase. Indeed, we cannot conclude that an isolated phrase is ambiguous simply because Appellee failed to define it specifically in the policy. *See Riccio, supra* (insurance contract must be construed as a whole). Rather, we examine the policy in its entirety to determine whether it clearly, explicitly, and unambiguously conditions full replacement benefits upon the actual repair or replacement of the damaged property. We conclude that it does.

¶ 12 A routine reading of the policy and endorsement demonstrates that replacement benefits are conditioned upon complete repair or replacement. Section 3(b)(4) of the policy explains that Appellee "will pay no more than the actual cash value of the damage **until** actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss according to the provisions of b.(1) and b.(2) above [regarding replacement costs without deduction]." Homeowner Broad Form Policy, at 9 (emphasis added). The personal property endorsement contains language that parallels this provision. Hence, notwithstanding the divergent meaning of the phrase when applied to antiques and collectibles, when the aforementioned policy language is read in its entirety, it is clear and unambiguous. As the policy plainly sets forth the procedure for recovering replacement costs, a contrary construction is unreasonable.

■ ¶ 13 Appellants also posit that the personal property endorsement is ambiguous because it contains conflicting promises. Specifically, Appellants assert that since the endorsement limits payment of claims in excess of $500 to actual cash value until the repair or replacement is complete, it conflicts with Appellees' previous promise to settle a property loss at replacement cost at the time of the loss. This argument is tenuous. The settlement limitation does not conflict with Appellee's promise to pay, it merely conditions full payment upon repair or replacement. Again, when read in its entirety, the terms of the settlement procedure set forth in the personal property endorsement reproduced *supra* are clear and unambiguous.

■ ¶ 14 For the first time on appeal, Appellants also contend that our decision in *London v. Insurance Placement Facility of Pennsylvania,* 703 A.2d 45 (Pa.Super.1997), precludes Appellee from deducting and withholding depreciation until the damaged property has been repaired or replaced because the insurance policy does not expressly provide for it by defining "actual cash value" as replacement cost minus depreciation. However, since Appellants failed to present this issue in their motion for post-trial relief, it is waived. *Lenhart v. Cigna Companies,* 824 A.2d 1193 (Pa.Super.2003) (issues not raised in post-trial motions are waived for purposes of appeal); Pa.R.C.P. 227.1(b)(2).

¶ 15 Further, had Appellants preserved this issue, their reliance upon *London* would be misplaced because Appellee did not deny liability for replacement costs; rather, it merely conditioned payment of replacement costs upon complete repair or replacement. In *Kane v. State Farm Fire and Casualty,* 2003 PA Super 502, 841 A.2d 1038, we recently interpreted *London* as follows:

> Unlike *Fedas* [*v. Insurance Co. of State of Pennsylvania,* 300 Pa. 555, 151 A. 285 (1930) ], *Farber* [*v. Perkiomen Mut. Ins. Co.,* 370 Pa. 480, 88 A.2d 776 (1952) ], and *London,* wherein the insurers contested liability for such replacement costs without including depreciation, here, only the timing of such payments is at issue.[7] Thus, the policy considerations underlying these cases—that an insured should be made whole, and that in the absence of language to the contrary, to make an insured whole "actual cash value" must be interpreted to mean replacement value without depreciation—apply with less force herein as there is no question that Appellants will be made whole by Appellees ultimately, if not initially.

> [7]Appellants have not asserted that this two-step process, in itself, is contrary to Pennsylvania caselaw or public policy. We therefore, offer no opinion in that regard.

*Id.* at 1048. As the instant appeal implicates the identical issue this Court addressed in *Kane, London* would not be dispositive of this case either.

■ ¶ 16 Next, Appellants assert that the limitation provisions were not clearly worded or conspicuously displayed, thereby rendering them unenforceable. These arguments fail. First, as noted above, we previously concluded that both the policy and endorsement present the procedure for recovering full replacement costs clearly. The language, contrary to Appellants' characterization, does not contain a limitation; it describes how losses are settled and the amount of coverage permitted under the policy. Second, as the trial court noted, "The language set forth is not confusing, misleading, or ambiguous. It is the same size and style of print as is the remainder of the policy." Trial Court Opinion, 6/7/02, at 10. Hence, Appellants' contentions lack merit, and for all of foregoing reasons, the insurance policy is not ambiguous.

■ ¶ 17 Similarly, Appellants assert that the trial court erred in referring to supplemental provisions contained in paragraphs 2 and 3 of the policy and paragraph 2 of the endorsement in determining whether the terms of the contract were ambiguous because those provisions were not dispositive of the issue. Appellants' position ignores the trial court's standard of review. As noted *supra,* the trial court could not interpret the insurance contract in a vacuum. *Riccio, supra.* Thus, the trial court was **required** to review the contract in its entirety. The sections to which Appellants object merely articulate additional aspects of the parties' respective

obligations under the policy. Since a standard reading of the policy and endorsement indicates that Appellants had a duty to repair or replace the damaged property as a condition to the receipt of replacement cost benefits, the trial court did not err in referring to the ancillary provisions.

¶ 18 Next, Appellants assert that Appellee's practice of requiring claimants to rebuild damaged property with like construction using a line-item estimate and replace damaged personal property with property of like kind is a breach of the insurance contract because it is not expressly provided in the policy. While acknowledging that the conditions are tedious, the trial court could not conclude that they constitute a breach of contract. Neither can we.

¶ 19 The following facts are relevant. After suffering a loss to her residence, class representative Terri Burton wanted to remove an existing wall to enlarge her bedroom. Since the modification was not "like construction" as contemplated by the line-item estimate, Appellee refused to pay for that alteration. Similarly, Appellee refused to pay class member Steve Ryan's claim to the extent that he chose to install carpet over what originally were finished hardwood floors.

¶ 20 With regard to the like-construction requirement, the trial court noted, " 'Like construction' means that a policyholder has to return the damaged structure as closely as possible to the condition it was in immediately prior to the loss. For example [Appellee] requires policyholders to replace shingles with shingles and to replace drywall with drywall." Trial Court Opinion, 6/7/02, at 10. We agree with the trial court's characterization. Since insurance policies are based on principles of indemnity rather than enrichment, claimants should not be permitted to exploit their losses and use them as an opportunity to remodel their homes at the insurer's expense. *Insurance Co. of North America v. Alberstadt*, 383 Pa. 556, 119 A.2d 83 (1956) (insured cannot recover more than amount lost). Hence, we conclude that Appellee's practice of requiring a claimant to rebuild the structure as it was before the loss is reasonable. It certainly cannot be construed as a breach of the insurance contract.

¶ 21 The policy expressly limits replacement benefits to like construction. The policy provides as follows:

3. **Loss Settlement.** Covered property losses are settled as follows:

. . . .

b.

(1) If, at the time of the loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

. . . .

(b) The replacement cost of that part of the building damaged for **like construction** and use on the same premises;

*Id.* (emphasis added). Thus, the policy adequately indicates that a claimant is expected to perform like construction in order to receive the full extent of benefits under the policy.

¶ 22 Additionally, claimants are not entitled to their replacement costs unless they set forth their costs using detailed line-item estimates. The relevant provision provides, in pertinent part, as follows:

2. **Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done:

. . . .

g. Send to us, within 60 days after our request your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

. . . .

(5) Specifications of damaged buildings and **detailed repair estimates;** Broad Form Policy, at 8 (emphases added). This provision is clear and unambiguous. Claimants are obligated to submit a detailed repair estimate following a loss. George Haller, Mrs. Burton's contractor, testified that line-item pricing is the generally accepted means of estimating within the insurance industry. N.T., Trial, 5/1/01, at 320. Hence, Appellee did not breach the insurance contract by requiring Appellants to utilize detailed line-item estimates to confirm that they actually rebuilt the damaged property with like construction.

¶ 23 Similarly, with regard to the like-kind replacement of personal property, Appellee generally expected claimants to replace damaged items with items of like kind and quality. For example, claimants are expected to replace damaged draperies with draperies of similar quality rather than blinds.

¶ 24 As noted *supra,* Appellants contend that Mrs. Burton is entitled to an additional $979.82 for personal property that she was unable to demonstrate had been repaired or replaced with items of like kind. According to Mrs. Burton's testimony, she stored all of her receipts in a single envelope. However, some receipts did not indicate the actual item purchased. Rather than making a notation on these generic receipts identifying the items purchased, Mrs. Burton stored the generic receipts with the other receipts. Thus, when she later attempted to organize the receipts in preparation of her claim, she was unable to identify certain items. As such, Mrs. Burton's shortfall is a consequence of her poor record keeping and, also, in derogation of her duties as an insured.

¶ 25 Although the personal property endorsement does not provide for like-kind replacement explicitly, it incorporates the aforementioned provision setting forth the claimants obligations following a loss, wherein the claimants are required to keep precise records justifying the claim. Subparagraph e, concerning personal property, provides as follows:

2. **Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done:

. . . .

e. Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. **Attach all bills, receipts and related documents that justify the figures in the inventory;**

*Id.* (emphasis added). Hence, the claimants are obliged to submit a detailed inventory and receipts to support their personal property claim. Since this requirement could serve no other purpose but to confirm that a claimant replaced her losses with items of like kind, they are necessary to process the claim. Consequently, Appellee did not breach the insurance contract by demanding that Appellants validate the cost of the personal property lost.

¶ 26 Next, Appellants assert that Appellee's insurance policy is unconscionable because it requires a claimant to repair or replace the damaged property completely before receiving the full extent of the replacement benefit contemplated in the policy. After reviewing the relevant case law and the express terms of the insurance policy, we disagree.

¶ 27 The determination of conscionablity is a question of law to which our review is plenary. *Lytle v. CitiFinancial Services, Inc.*, 810 A.2d 643 (Pa.Super.2002). The two-prong test for unconscionability is whether one of the parties lacked a meaningful choice before accepting the terms of the provision and whether the provision unreasonably favors the drafter. *Ferguson v. Lakeland Mutual Insurance Co.*, 408 Pa.Super. 332, 596 A.2d 883 (1991); *Koval v. Liberty Mutual Insurance Company*, 366 Pa.Super. 415, 531 A.2d 487 (1987).

¶ 28 Since consumers cannot negotiate the terms of their insurance policies, we generally view insurance contracts as contracts of adhesion. *See Ferguson, supra* (insurance consumers lack negotiating position and must adhere to terms of form contracts). Thus, our examination is limited to the second prong of the two-part test. *Lytle, supra* (contracts of adhesion are not unconscionable unless terms unreasonably favor drafter).

¶ 29 Appellants argue that application of the "replacement cost" provisions is unreasonable because it forces claimants to accept a reduced amount without a guarantee of reimbursement. In support of this contention, Appellants seek to rely upon our reasoning in *Ferguson*.

¶ 30 In *Ferguson*, the claimants sought to collect benefits under their homeowners' policy after lightning struck their Lowry C–500 organ. That policy contained a replacement provision similar to the instant policy. The insurance company denied the claim, and the claimants were forced to initiate a lawsuit to establish liability. During the trial, the parties stipulated that the actual cash value of the organ was $5,700, and the insurance company argued that any liability would be limited to that amount because the claimants failed to repair or replace the organ prior to seeking replacement costs. Conversely, the claimants sought judgment in excess of $20,000 to replace the organ. The trial court agreed with the claimants and instructed the jury to disregard the replacement cost provision because it was oppressive. Thereafter, the jury returned a verdict for $23,317.40.

¶ 31 On appeal, this Court held that the replacement cost provision was unconscionable because it required claimants to advance the cost of replacement with no guarantee that they would be reimbursed. We reasoned that since the insurance company denied liability for the damaged organ, the claimants could only have received replacement cost after they had repaired or replaced the organ **and** prevailed in litigation. Therefore, we held that the replacement provision placed an unreasonable obligation upon claimants prior to receiving any benefit. We noted, "[U]nder the terms of the contract, Appellees could have only received replacement value in this instance after expending the replacement or repair funds and obtaining a judicial determination concerning liability. Thus, . . . we find the replacement requirement unconscionable despite the clear and unambiguous language of the policy." *Ferguson*, 596 A.2d at 885.

¶ 32 In a well-reasoned analysis of *Ferguson*, the learned President Judge Francis F. Fornelli, Mercer County Court of Common Pleas, succinctly reduced our reasoning in *Ferguson* to the following elements:

> (1) insurer's denial of liability; (2) insureds' "unsavory" choice of either accepting actual cash value or expending a large sum in replacement costs without a guarantee of reimbursement; and (3) any payment of replacement value by insurer hinged on either expending funds or obtaining a judicial determination of liability.

*Rotell v. Erie Ins. Group,* 53 Pa. D. & C.4th 533, 544 (2001). In *Rotell,* President Judge Fornelli concluded that *Ferguson* did not apply because the insurer therein did not deny benefits, present the claimant with the "unsavory" choice of accepting a reduced amount and paying replacement costs without a guarantee of reimbursement, or condition payment of replacement costs upon obtaining a liability determination. Although we are not bound by the common pleas court's determinations, we are guided by its insightful rationale.

¶ 33 In the case *sub judice,* the trial court employed identical reasoning in distinguishing the instant case from *Ferguson.* We agree, and we decline to extend *Ferguson* beyond the facts of that case. Instantly, Appellee admitted liability and paid Appellants the actual cash value of the damage claim at the time of the loss. It did not condition replacement cost upon receiving a judicial determination of liability; rather, it conditioned benefits upon Appellants' compliance with the stated settlement procedures. Thus, unlike the claimants in *Ferguson,* Appellants' replacement benefits were guaranteed to the extent Appellants demonstrated that they had replaced or repaired the damaged property. Since Appellants were not obligated to pursue a claim to determine liability before receiving benefits, this case is distinguishable from *Ferguson.*

¶ 34 Moreover, we disagree with the crux of Appellants' argument that the obligation to replace damaged property with like construction or items of like kind raises an uncertainty as to whether claimants will be reimbursed. As noted *supra,* certain class members did not receive full replacement cost benefits because they failed to perform like construction or replace the damaged property with items of like kind. As the onus is upon the claimant to abide by the settlement procedure,

no uncertainty should exist. Even where a claimant fails to comply with the terms of the settlement process and purchases property that is arguably dissimilar, the resulting uncertainty is not equivalent to *Ferguson,* where the claimants were forced to replace the damaged items **before** liability had been established. As such, the instant insurance contract is not unconscionable.

¶ 35 Finally, Appellants argue that the trial court erred in granting summary judgment in favor of Appellee regarding Appellee's alleged breach of the implied duty of good faith and fair dealing. We review a trial court's grant or denial of a motion for summary judgment for an abuse of discretion. *Northern Ins. Co. of New York v. Resinski,* 2003 PA Super 246, 827 A.2d 1240. Summary judgment is appropriate only where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Id.* Our scope of review is plenary, and we view the record in the light most favorable to the non-moving party resolving all doubts in his favor. *Id.*

¶ 36 Under Pennsylvania jurisprudence, insurers owe a duty of good faith and fair dealing to their insureds. *Fedas v. Insurance Co. of State of Pennsylvania,* 300 Pa. 555, 151 A. 285 (1930); *Dercoli v. Pennsylvania Nat. Mut. Ins. Co.,* 520 Pa. 471, 554 A.2d 906 (1989). Among other duties, the implied covenant creates an obligation to disclose fully the coverage and any requirements under the policy. *Id.* The covenant arises from the nature of insurance contracts and the fiduciary relationship between an insurance company and its insureds. *Romano v. Nationwide Mutual Fire Ins. Co.,* 435 Pa.Super. 545, 646 A.2d 1228 (1994).

¶ 37 Appellants' instant contentions implicate Appellee's duty to disclose the requirements associated with the set-

tlement procedure. Appellants posit that absent detailed language specifying the requirement that claimants employ line-item pricing for construction and like-kind replacement for personal property, Appellee breached its duty of good faith and fair dealing by conditioning replacement benefits upon their completion. Appellants essentially recycle their argument concerning the ambiguity of settlement procedures and the alleged breach of contract for requiring like-kind replacement. As we addressed this issue *supra* and concluded that the policy set forth the settlement procedures adequately, we cannot reasonably find that Appellee failed to disclose these procedures in breach of its duty of fair dealing.

¶ 38 For all of the foregoing reasons, we affirm both the trial court's grant of summary judgment as to the alleged breach of the duty of good faith and fair dealing and the court's entry of judgment on the verdict.

¶ 39 Judgment affirmed.