Sabrina **BROWN** and Joseph **Brown** (Husband), Appellants

v.

**EVERETT CASH MUTUAL INSURANCE COMPANY, Dennis Holsinger (as Agent and/or Employee of Everett Cash Mutual), and William T. Scott Appellees**

No. 1549 WDA 2015

Superior Court of Pennsylvania.

Argued November 29, 2016
FILED MARCH 10, 2017

David J. Russo, Waynesburg, for appellant.

Aimee R. Jim, Latrobe, for appellee.

BEFORE: LAZARUS, J., SOLANO, J., and STRASSBURGER, J.*

OPINION BY LAZARUS, J.:

Joseph and Sabrina Brown, h/w, (collectively, the Browns) appeal from the order, entered in the Court of Common Pleas of Greene County, granting summary judgment in favor of Appellees, Everett Cash Mutual Insurance Company, Dennis Holsinger (as agent and/or employee of Everett Cash Mutual), and William T. Scott (collectively, Everett Cash). After careful review, we reverse and remand.[1]

Sabrina Brown and her father, William T. Scott ("Scott"),[2] owned a farm home ("residence") in Carmichaels, Pennsylvania, as joint tenants with a right of survivorship. The residence was covered by an insurance policy issued by Everett Cash. Sabrina and Scott were the named insureds on the policy. In July 2007, the residence burned to the ground as a result of an accidental electrical fire; the home was deemed a "total loss." The fire quali-

---

* Retired Senior Judge assigned to the Superior Court.

1. We, herein, deny Everett Cash's motion to strike the Browns' appeal due to their failure to have the summary judgment oral argument transcribed or to file a designation of contents of the reproduced record pursuant to Pa. R.A.P. 2154(a). Because summary judgment is proper "when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits demonstrate that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law," *see* Pa.R.C.P. 1035.2, our plenary review is not hampered by the inability to re-view the notes from oral argument. Likewise, Appellants contravention of Rule 2154 does not hinder our ability to decide the case. We also recognize, however, that any errors complained of on appeal that are based on statements or arguments asserted for the first time at oral argument on Appellee's motion for summary judgment are waived. *See Bennyhoff v. Pappert*, 790 A.2d 313, 318 (Pa. Super. 2001) (where review of appellant's claim may not be made because of defect in record, we may find issue waived).

2. Scott has died since the filing of this lawsuit.

fied as a covered loss under the insurance policy.[3]

In January 2008, Dennis Holsinger, an adjuster on behalf of Everett Cash, prepared an itemized breakdown of losses, costs and depreciation, less the policy deductible, to arrive at an actual cash value of the residence. Specifically, Holsinger valued the replacement cost of the house at $100,269.39, with a 35% depreciation of $35,094.29, for an actual cash value of $65,175.10. With an additional payment of $6,000.00 for debris removal minus the insureds' $250.00 deductible and a $9,456.68 contribution to the Cumberland Township Fire Escrow Fund, Everett Cash issued the insureds a check for $61,468.42 in January 2008. Under the policy the insurance company was required to issue reimbursement checks payable to both Sabrina and Scott; Scott refused to sign the check. As a result, the first reimbursement check expired 180 days after its issuance. Everett Cash ultimately requested a stop-payment order on the check and reissued another check, in October 2008, to Sabrina and Scott for the same amount.

In addition to a check for the actual cash value of the house, Everett Cash also paid the Browns four months of living expenses totaling $1,800. In a letter dated November 7, 2007, Everett Cash denied the insureds' request for additional living expenses under the policy because the residence had not been rebuilt in a reasonable amount of time following the fire. Specifically, Everett Cash denied the request based on the following policy language:

**Coverage D—Additional Living Costs and Loss of Rent**

"We" pay the necessary and reasonable increase in living costs "you" incur to maintain the normal standard of living of "your" household if a part of the "insured premises" is made unfit for use by an insured loss. "We" pay only for the period of time reasonably required to make the "insured premises" fit for use or until "your" household is permanently relocated, whichever is less.

**PAYMENT OF LOSS OR CLAIM**

\* \* \*

2. **Additional Living Costs—**If the "insured premises" is made unfit for use for more than one month, covered costs are paid on a monthly basis. "You" must give "us" proof of such costs.

Everett Cash Mutual Farmowners Policy, AAIS Form FO-1, at 5; FO-20, at 6 (emphasis added).

On October 30, 2008, the Browns filed a civil complaint against Everett Cash raising claims of breach of contract, bad faith, civil conspiracy and *respondeat superior* liability. In addition to their claims that Everett Cash breached the insurance agreement and denied them policy benefits in bad faith, the Browns also alleged that Scott entered into a conspiracy with Everett Cash's adjuster, Holsinger, to pay Scott 100% of the proceeds of the loss.

The trial court ultimately determined that Everett Cash was entitled to summary judgment, specifically concluding that because the Browns failed to agree on how to use the insurance proceeds, they were at fault for not rebuilding within a reasonable amount of time as required under the policy provisions.[4] With regard to

---

**3.** The policy provided liability limits of $98,000 for the residence, $68,600 for personal property losses, and $19,600 for additional living expenses, all subject to a one-time $250 deductible.

**4.** According to the parties' policy:

When the cost to repair or replace exceeds the lesser of $2,500 or 5% of the "limit" on the damaged building, "we" do not pay for

the Browns' bad faith claim, the court determined that the claim failed, as a matter of law, because the Browns did not "provide any evidence that the Defendants' actions were motivated by self-interest or ill-will. [Rather,] Plaintiff's claims were denied because they failed to satisfy the prerequisites for coverage[.]" Trial Court Opinion, 9/4/15, at 8.

On October 5, 2015, the Browns filed a notice of appeal from the trial court's summary judgment order. They present one issue for our consideration: Was it appropriate for the trial court to grant summary judgment where issues of fact, issues of law and compliance with an insurance policy are left disputed and unresolved?

Th[e] scope of review of an order granting summary judgment is plenary. Our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or clearly abused its discretion. Summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. The reviewing court must view the record in the light most favorable to the nonmoving party, resolving all doubts as to the existence of a genuine issue of material fact against the moving party. When the facts are so clear that reasonable minds cannot differ, a trial court may properly enter summary judgment.

*Valentino v. Phila. Triathlon, LLC*, 150 A.3d 483, 490 (Pa. Super. 2016) (citing *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 812 A.2d 1218, 1221–22 (2002)). Moreover,

more than the actual cash value of the loss until repair or replacement is completed. Brown's Everett Cash Farmowner Insurance Policy Replacement Value Additional

the non-moving party must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor. Failure to adduce this evidence establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

*Ertel v. Patriot–News Company*, 544 Pa. 93, 674 A.2d 1038, 1042 (1996).

When reviewing an insurance contract on appeal, we note that our Court's scope of review is plenary. *Cresswell v. Pennsylvania National Mutual Casualty Ins. Co.*, 820 A.2d 172 (Pa. Super. 2003). Moreover,

[i]n interpreting the terms of an insurance contract, the appellate court examines the contract in its entirety, giving all of the provisions their proper effect. The court's goal is to determine the intent of the parties as exhibited by the contract provisions. In furtherance of its goal, the court must accord the contract provisions their accepted meanings, and it cannot distort the plain meaning of the language to find an ambiguity. Moreover, it will not find a particular provision ambiguous simply because the parties disagree on the proper construction; if possible, it will read the provision to avoid an ambiguity.

*Burton v. Republic Ins. Co.*, 845 A.2d 889, 893 (Pa. Super. 2004). **Replacement Cost v. Actual Cash Value**

The Browns assert that they were entitled to full replacement value, not just actual cash value, under the Everett Cash insurance policy on their home.

Form/Coverage, #FO–55, at 1/3 (emphasis added).

Under the Everett Cash policy, replacement cost is defined as "the cost to repair or replace the property with new property of equivalent kind and quality to the extent practical, without deduction for depreciation." Everett Cash Endorsement, FO–55, at 1. *See Gilderman v. State Farm Ins. Co.*, 437 Pa.Super. 217, 649 A.2d 941, 942 (1994) (replacement cost under insurance policy "allows recovery for the actual value of property at the time of loss, without deduction for deterioration, obsolescence, and similar depreciation of the property's value."). The Everett Cash policy also provides:

> When the cost to repair or replace exceeds the lesser of $2,500 or 5% of the limit on the damaged building, <u>"we" do not pay for more than the actual cash value of the loss until repair or replacement is completed.</u>

Brown's Everett Cash Farmowner Insurance Policy Replacement Value Additional Form/Coverage, #FO–55, at 1/3 (emphasis added). Moreover, under the policy

> **Actual Cash Value Terms**—Actual cash value includes a deduction for depreciation, however caused.
>
> > <u>The Actual Cash Value Terms apply to all property **not** subject to the Re-</u>placement Cost Terms.

Actual cash value typically has been determined to be the repair or replacement cost of an entire structure before a fire, minus depreciation. *Fedas v. Insurance Co. of State of Pennsylvania*, 300 Pa. 555, 151 A. 285 (1930).

The Browns claim that the insurance company "used th[e replacement cost] provision as a shield and a sword by refusing to issue any money or any check under the policy until 2008" yet "continu[ing] to refuse to issue any type of structure payment." Appellant's Brief, at 32. However, under the express terms of the policy, Everett Cash was only obligated to pay the Browns more than the actual cash value of the residence, or the full replacement value, if they repaired or replaced the residence. Instantly, the insureds failed to timely repair or replace the residence; therefore, they were not entitled to the full replacement cost of the residence. Despite their failure to act, Everett Cash informed the Browns in a February 2008 letter that "if [they] actually complete the repair or replacement, they may submit a claim for the balance [of the replacement cost minus the actual cash value, or the depreciation] at that time." Everett Cash Letter, 2/1/08, at 7.

The Browns contend that they were unable to rebuild a home without the full replacement cost proceeds from the Everett Cash policy. However, in the record is a letter from Rt. 21 Homes Inc. to Everett Cash indicating that the Browns had in fact put a down payment on a home back in 2007, but cancelled the deal and had their money refunded. Rt. 21 Homes Inc. Letter, 4/30/12. In their answers to interrogatories, the Browns admit that they gave Rt. 21 Homes a $2,000 down payment to secure a new modular home. Moreover, Joseph Brown indicated in his deposition that the Browns did not rebuild because of dissension between Sabrina and Scott. *See* Joseph Brown Deposition, 12/19/14, at 66 ("[Sabrina and Scott] were disputing over what house was getting put on the property.").[5]

---

5. We note, with disapproval, that only portions of Sabrina Brown's deposition are included within the certified record on appeal. Moreover, the Browns fail to include the page of the transcript indicating the date on which Sabrina's deposition was conducted. We remind the Browns that as the appellants, they are tasked with providing an adequate certified record for appellate review. *See* Pa.R.A.P.

In *Burton, supra,* our Court was faced with determining whether "[an insurance company's] policy concerning replacement costs [was] ambiguous or unconscionable, and whether [the insurance company's] practice of requiring claimants to replace the lost property with property of like kind constitute[d] a breach of contract." *Id.* at 892–93. In *Burton,* the insureds had similarly suffered a substantial property loss due to a residential fire. The insureds did not repair certain items contemplated in the estimate and performed additional construction without authorization; as a result, the insurance company paid the insureds the actual cash value of the property loss, but withheld the depreciated value. *Id.* at 892. The loss settlement and personal property endorsement provisions of the parties' insurance policy provided that the insurer would "pay no more than the actual cash value [for the loss or] damage until actual repair or replacement is complete." *Id.* at 893. Ultimately, our Court concluded that the policy clearly, explicitly, and unambiguously conditioned full replacement benefits upon the actual repair or replacement of the damaged property. *Id.* at 894.

Similarly, in the instant matter, the insureds' policy with Everett Cash clearly and explicitly set forth the procedure for recovering replacement costs—namely, complete replacement of the damaged property. Because the insureds failed to fulfill the condition precedent, the insurer was well within its right to offer only actual cash value of the demised premises according to the express language of the policy. Thus, we find that the court properly granted summary judgment on this issue, since Everett Cash did not breach the insurance policy by paying the Browns the actual cash value, rather than the replacement value of the residence. *Burton, supra. See also Kane v. State Farm Fire &*

*Cas. Co.,* 841 A.2d 1038 (Pa. Super. 2003) (language of multiple homeowner's policies justified payment of actual cash value of losses, not full replacement costs until insureds undertook replacements).

### Additional Living Expenses

■ The Browns also claim that they should have received the full $19,600.00 policy limit for additional living costs. Overall, Everett Cash paid the insureds a total of four months' worth of additional living expenses that they incurred from September 2007 through December 2007, totaling $1,800.00.

The Everett Cash policy states, "If the 'insured premises' is made unfit for use for more than one month, covered costs are paid on a monthly basis. **'You'** must give **'us' proof of such costs.**" Everett Cash Farmowner's Insurance Policy, FO–20, at 6 (emphasis added). The policy also states that the insurer will pay "the necessary and reasonable increase in living costs [the insureds] incur to maintain the normal standard of living of "your" household if a part of the 'insured premises' is made unfit by an insured loss. [The insurer] pay[s] only for the period of time *reasonably required to make the 'insured premises' fit for use* or until 'your' household is permanently relocated, **whichever is less.**" Everett Cash Farmowner's Insurance Policy, Coverage D—Additional Living Costs and Loss of Rent, FO–1, at 5 (emphasis added).

In a February 2008 letter to the Browns, Everett Cash indicated that the reason why Everett Cash had only paid additional living expenses of $1,800.00 was because it determined that "a reasonable period of time had transpired" after the loss. However, the insurer did offer to extend the payment of additional living expenses for an additional two months

1911(a); *see also Smith v. Smith,* 431 Pa.Super. 588, 637 A.2d 622 (1993).

(January 2008 and February 2008) **"upon presentation of proof of the amount of such expenses."** Everett Cash Letter, 2/1/08, at 4.

In his deposition, Mr. Brown testified that his family moved in with the May family three weeks after the fire. He testified that they paid the Mays $450.00/month in rent and agreed to a six-month lease term. Joseph Brown Deposition, 12/19/14, at 34–35; 43. After the first six months, the Browns paid the Mays rent on a month-to-month basis until May 2008. Mr. Brown testified that they executed lease agreements with the Mays. However, Brown could not definitely say that he submitted all proof of rent/living expenses to Everett Cash. *Id.* at 49.

Instantly, the certified record contains copies of four receipts (September 2007, October 2007, November 2007 and December 2007) signed by Vivian May representing the Brown's monthly rent of $450.00 for the Stringtown Road, Carmichaels home. Because the insureds never submitted any further proof of loss for such living expenses, Everett Cash had a reasonable basis for only paying the Browns four months' worth of living expenses and denying additional living expenses based on the clear policy language demanding proof of such expenses and that the expenses be paid for only a reasonable amount of time after the loss for purposes of rebuilding the demised premises.[6]

## Improper Replacement Cost & Rate of Depreciation (Appraisal)

■ The Browns allege that Everett Cash "applied a usurious inapplicable rate of [35%] depreciation to the property" to arrive at the actual cash value of their

home. Plaintiffs' Complaint, 10/30/08, at ¶ 45. In support of this claim, the Browns averred that in 2007, prior to the fire, they made roughly $16,000.00 in improvements to the residence. Everett Cash, on the other hand, asserts that the Browns failed to provide any credible testimony to suggest that the 35% rate was unreasonable considering the age (107 years old) and condition (average) of the residence and the fact that only select portions of the house had been remodeled prior to the fire. *See* Appellee's Brief, at 28.

In 2013 the Browns hired an independent appraiser to determine the replacement cost of their home, what the depreciation would have been on the remodeled and non-remodeled portions of the home, and what the ultimate depreciated value of the home at the time it was destroyed would have been. The appraiser calculated the replacement cost at $127,010, the depreciation at 18% (remodeled portion) and 28% (non-remodeled portion), and the total depreciated value of the home at $87,000. *See* J.K. Willison Real Estate, Inc. Appraisal by Gwen R. Nicholson, 5/15/13. In explaining how she arrived at these figures, the appraiser stated the following in a revised addendum to the original appraisal:

> Based on the original appraisal the Total Building Cost New was identified at $127,010. The Appraiser, using Marshall and Swift Cost Handbook, assigned the subject property a typical life expectancy of 60 years and an Effective Age of 20 years at the time the home was destroyed by fire. This would g[i]ve the home a depreciation ratio of 18%.

---

6. New proof of any additional living expenses included in the Browns' supplemental reproduced record cannot be considered by this Court on appeal. *See Dorn v. Stanhope Steel, Inc.*, 368 Pa.Super. 557, 534 A.2d 798, 814

n.1 (1987) (appellate court must limit review to matters testified at trial and those exhibits that appear in original record; we cannot consider those items that appear in reproduced record, but not in original record).

Based on information reviewed from the property owner and information gathered from public records the Appraiser has estimated that roughly 30% of the home was not remodeled. This factor would include[ ] the exterior of the home.

The Appraiser then added additional depreciation to the unremodeled portion (30%) of the subject home. The Appraiser depreciated this portion at 10%.

The Appraiser made an additional miscellaneous depreciation adjustment based on Cost of Living. The subject home was valued as of 2007, but cost figures were based on 2009 Marshall and Swift Information. It is the opinion of the Appraiser that this factor warrants an additional adjustment. The Appraiser has used a factor of 5% or 2.5% per year for this additional adjustment.

This revision has also been completed to correct an error from the original report. In the original report the Appraiser used the additional 10% depreciation factor on the entire subject property and not only the unremodeled portion. After making this change **the indicated value of the subject property increased to $95,000.**

Gwen R. Nicholason's Comment Addendum to Original Appraisal, 6/19/15 (emphasis added).

In the comment section to the appraiser's final report, it is noted that the appraiser used the "Cost Approach" method, one of several methods to estimate a home's value. Interestingly, the report states that "[be]cause of the amount of depreciation that is needed for older homes, th[e Cost Approach] of evaluating properties is *not deemed reliable. Although the Appraiser did choose to develop this method in this assignment **it will not be given the most weight in the final determination of value.*"* J.K. Willison Real Estate, Inc. Comments Addendum to Final Appraisal, Final Reconciliation, 6/19/15, at 8 (emphasis added).

Joseph Brown testified at his deposition that Everett Cash's appraiser, Holsigner, never asked whether the residence had been remodeled prior to the accident, did not use comparables to assess the value of the home, and was unable to view the interior condition of the home before and after the fire. N.T. Joseph Brown Deposition, 12/19/14, at 129.

Based upon the rather large discrepancy between the actual cash value and depreciation of the residence calculated by the Brown's appraiser and the undefined 35% depreciation rate attributed to the structure by Everett Cash, we conclude that a genuine issue of material fact exists [7] and that the court improperly granted summary judgment on this issue. [8]

7. An amendatory endorsement to the policy added the following to the term "actual cash value."

   Actual cash value means the cost to repair, replace or reconstruct the property, whichever is less, subject to deduction for depreciation, but consideration may also be given by "us" to age, condition, deterioration, economic value, market value, obsolescence (both structural and functional), original cost, use and other circumstances that may reasonably affect values, in "our" determination of actual cash value.

Everett Cash Insurance Policy Amendatory Endorsement, FO–778 11.99 (emphasis added).
   We instruct the court, upon remand, to pay particular attention to the various factors to be considered when arriving at a depreciation rate for the residence.

8. We also note that the parties' policy provides that in the event the Browns and Everett Cash do not agree with the insurer's valuation of the property, they can seek a binding appraisal. Everett Cash claims that because the Browns never exercised this option, they

## Ordinance Payment

■ Plaintiffs contend that Everett Cash improperly deducted the ordinance payment to the township from the actual cash value that they received under the policy. Moreover, they claim that Everett Cash purposely deducted this amount from their payout in order to "eliminate" them from rebuilding their residence, which in turn prevented them from receiving the replacement cost of their residence. However, the Browns were advised that once they cleared the site or rebuilt the structure as per the township ordinance, they would be able to recover this payment from the township supervisor or township secretary. Because they failed to rebuild the structure, they were not entitled to have these monies returned to them under the policy.

## Conspiracy

■ Plaintiffs contend that Everett Cash's adjustor, Holsinger, conspired with Scott and prevented Sabrina Brown from receiving the proper amount of insurance proceeds under the Everett Cash policy. Specifically, they claim in their complaint that Scott "talked with, agreed with, or came to some understanding of, and entered into an agreement with ... Everett Cash Mutual Insurance Company through their agent Dennis Holsinger not to sign the checks that were being issued to ... Scott and ... Sabrina Brown." Plaintiffs' Complaint, Count IV: Conspiracy, at ¶ 60.

■ It is well established that "a civil conspiracy is a combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose." *Baker v. Rangos*, 229 Pa.Super. 333, 324 A.2d 498, 506 (1974) (citations omitted).

In answers to interrogatories, the Browns stated that once Holsinger contacted Scott, Scott refused to rebuild the home with the Browns despite the parties' prior agreement to rebuild the home, selection of the new home, agreement to bid on foundation, and down payment on a new home. The fact that Scott changed his mind about rebuilding the home sometime after he spoke with Holsinger does not prove that he entered into a conspiracy with Holsinger. *See* Appellants' Brief, at 42. In fact, Joseph Brown testified that he was not privy to any conversation between Scott and Holsinger and that all he knew was that Scott "had a conversation with Mr. Holsinger," after which Scott "became reluctant to sign any checks." Joseph Brown Deposition, 12/19/14, at 61. *See id.* at 60 ("Maybe he discussed something with Mr. Holsinger behind our back. I don't know."). Moreover, Plaintiffs' testimony that they were at odds with Scott, which in turn stalled their plans to rebuild the residence and prevented them from signing the separate checks for timely reimbursement, vitiates their conspiracy claim. *See Weiner Grose v. Procter & Gamble Paper Products*, 866 A.2d 437 (Pa. Super. 2005) (bald assertions of conspiracy are insufficient to properly plead civil conspiracy; plaintiff must set forth facts supporting existence of a conspiracy that would

have not established that Everett Cash's depreciation rate was unreasonable or in bad faith. We note, however, that the relevant policy provision provides that in the event "you [the Browns]' and 'we [Everett Cash]' do not agree as to the value of the property or the amount of the loss, [that] 'you' and 'we' will **each** select a competent appraiser within 20 days after receiving a written request from the other." Everett Cash Insurance Policy, "Other Condition," FO–20 Ed 1.0, at 6. Because the policy requires action on the part of both the insurer and the insureds, we do not believe that the Browns have waived exercising this option upon remand.

suggest common plan or scheme to defraud).

**Bad Faith**

In an insurance context,

"[b]ad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty through some motive of self-interest or ill will. Mere negligence or bad judgment is not bad faith. Further, bad faith must be proven by clear and convincing evidence and not merely insinuated. Finally, to recover under a claim of bad faith, the plaintiff must show that the defendant did not have a reasonable basis for denying benefits under the policy and that defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim.

*Bombar v. West Am. Ins. Co.*, 932 A.2d 78, 90 (Pa. Super. 2007), citing *Terletsky v. Prudential Property and Casualty Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680, 688 (1994) (citations and quotations omitted).

■ As part of their claim that Everett Cash acted in bad faith, the Browns contend that Everett Cash improperly refused to issue separate checks to each insured, Scott and Brown. However, according to the clear language of the policy, unless a loss payee is named on the policy, insurance benefits are made directly to the insureds as they are identified on the Declarations Page of the policy. Everett Cash instructed Brown to have Scott give his written consent to the issuance of two separate reimbursement checks. Everett Cash was even willing to deposit the funds into court in an interpleader action so the parties could determine their entitlement. Plaintiffs did not proceed with either op-

tion. As a result, the check could only issue in both Brown's and Scott's names. This claim has no merit.

■ To the extent that the Browns assert a bad faith claim against Holsinger, we agree with the trial court that a statutory action for bad faith can only be brought against an insurer. *See* 42 Pa.C.S. § 8371. Thus, there is no foundation for this claim.

Order reversed. Case remanded for proceedings consistent with this decision. Jurisdiction relinquished.